# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 16-839

JIMMY WILLIAMS, SR., ET AL.

VERSUS

PLACID OIL COMPANY, ET AL

**\*\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**TENTH JUDICIAL DISTRICT COURT**
**PARISH OF NATCHITOCHES, DOCKET NO. 76,787**
**HONORABLE LALA B. SYLVESTER, PRESIDING**
**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Elizabeth A. Pickett, John E. Conery, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Conery, J., concurs in part, dissents in part and assigns reasons.**

**Savoie, J., concurs in part, dissents in part and assigns reasons.**

Wells T. Watson
Jeffrey T. Gaughan
Baggett, McCall, Burgess, Watson & Gaughan
3006 Country Club Road
Lake Charles, LA 70605
(337) 478-8888
**ATTORNEY FOR PLAINTIFFS/APPELLEES**
  Jimmy Williams, Sr., Dalton Williams, Gwendolyn Hernandez, Jimmy Williams, Jr. and
  Jeannette Shows

Lewis O. Unglesby
Lance Unglesby
Unglesby Law Firm
246 Napoleon Street
Baton Rouge, LA  70802
(225) 387-0210
**ATTORNEY FOR PLAINTIFFS/APPELLEES**
  Jimmy Williams, Sr., Dalton Williams, Gwendolyn Hernandez, Jimmy Williams, Jr. and
  Jeannette Shows


Donald Kelly
William Townsend
Kelly and Townsend
P.O. Box 756
Natchitoches, LA  71457
(318) 352-2353
**ATTORNEY FOR PLAINTIFFS/APPELLEES**
  Jimmy Williams, Sr., Dalton Williams, Gwendolyn Hernandez, Jimmy Williams, Jr. and
  Jeannette Shows


Joseph B. Morton
Richard M. Crump
Ebony S. Morris
Maron Marvel Bradley Anderson & Tardy LLC
201 St. Charles Ave., Suite 2411
New Orleans, LA  70139-6001
(504) 684-5100
**ATTORNEY FOR DEFENDANT/APPELLANT**
  Ingersoll-Rand Company


H. Alston Johnson, III
Phelps Dunbar LLP
400 Convention Street, Suite 1100
P.O. Box 4412
Baton Rouge, LA  70821-4412
(225) 346-0285
**ATTORNEY FOR DEFENDANT/APPELLANT**
  Ingersoll-Rand Company

**COOKS, Judge.**

On August 9, 2003, Myra Williams died at the age of 59. Several months prior to her death, Myra was diagnosed as having incurable, malignant mesothelioma. She endured a difficult and painful battle with that disease until her death. Myra was married to Jimmy Williams, Sr. and was the mother of four children.

Jimmy was exposed to asbestos fibers while working at the Placid Oil Facility in Natchitoches, Louisiana. Jimmy unknowingly brought the cancer causing fibers and dust home on his clothing after each day of work. Myra would handle and wash Jimmy's clothing, and sustained what is commonly referred to as bystander asbestos exposure. It is undisputed that Myra's constant exposure to Jimmy's work clothing caused her mesothelioma.

Jimmy and the four children filed suit on March 16, 2004, against several defendants, namely Placid Oil Company, Ingersoll-Rand Company, Petro-Hunt, L.L.C., LLECO Petroleum Products, Inc., CanadianOxy Offshore Production Co., J. Graves Insulation Company, Inc., Shreveport rubber & Gasket company, Anco Insulations, Inc., Garlock, Inc., General Electric Company, DHEC Corporation.[1] Plaintiffs' suit included both a survival action filed on behalf of Myra and wrongful death actions on behalf of Jimmy and the four children against the defendants. Soon after filing suit, Plaintiffs dismissed Petro-Hunt, CanadianOxy, DHEC, Anco and LLECO without prejudice. J. Graves Insulation filed a motion for summary judgment. That motion was unopposed by any party, and was granted by the trial court, dismissing Plaintiffs' claims against it with prejudice. Prior to trial, Plaintiffs settled with Placid Oil, Shreveport Rubber & Gasket and

---

[1] The other defendants named were Petro-Hunt, L.L.C.. LLECO Petroleum Products, Inc., CanadianOxy Offshore Production Co., J. Graves Insulation Company, Inc., Shreveport Rubber & Gasket Company, Anco Insulations, Inc., Garlock, Inc., General Electric Company, DHEC Corporation. Petro-Hunt and CanadianOxy were named as "successors in interest" to Placid Oil Company.

3

General Electric. That left Ingersoll-Rand as the only named defendant that proceeded to trial.

Ingersoll-Rand was the manufacturer of ten compressors that were installed in the "compressor room" of the Placid Oil facility. The turbo chargers and exhaust pipes for each compressor were insulated with asbestos. Plaintiffs also elicited testimony that the Ingersoll-Rand compressors had asbestos gaskets on them, which came directly from Ingersoll-Rand.

Ingersoll-Rand argued the compressor insulation was covered with aluminum sleeves which prevented release of the asbestos fibers. This was disputed by several witnesses who maintained many of the exhaust pipes were not covered with aluminum sleeves. There also was testimony that the aluminum sleeves that were attached did not prevent release of asbestos dust in the compressor room.

The sole exposure expert to testify at trial, Frank Parker, stated the compressors emitted "very significant [asbestos] dust," which was visible to the naked eye in the compressor room. Thus, he concluded Jimmy was exposed to huge concentrations of asbestos dust. Mr. Parker also opined there was no way Myra could have handled Jimmy's clothing without suffering asbestos exposure.

After a three-day bench trial, the trial court issued a judgment, accompanied by written reasons for judgment. As to the survival action, the trial court found Placid Oil and Ingersoll-Rand were at fault in causing Myra's mesothelioma and were each liable for their virile share. In regard to the wrongful death action, the trial court concluded that under the law Ingersoll-Rand was solely at fault in causing Myra's mesothelioma. Myra was awarded $3,000,000.00 in damages for her survival action. As to the wrongful death actions, Jimmy was awarded $1,000,000.00, and each of the four children were awarded $750,000.00 each.

4

Ingersoll-Rand has appealed the judgment of the trial court, asserting the following assignments of error:

1. The trial court erred in concluding that plaintiffs had proven a causal connection between the decedent's disease and Ingersoll-Rand Company products.

2. The trial court erred in declaring in a summary judgment that no fault could be allocated to J. Graves Insulation and that the judgment was a final judgment.

3. The trial court erred in assigning 50% responsibility to Ingersoll-Rand Company in the survival action.

4. The trial court erred in assigning 100% responsibility to Ingersoll-Rand Company in the wrongful death action.

5. The trial judge awarded excessive damages in the wrongful death action.

## ANALYSIS

I.  *Ingersoll-Rand's Liability*.

Ingersoll-Rand argues the trial court erred in finding Plaintiffs proved a causal connection between Myra's disease and Ingersoll-Rand's products. Finding the evidence at trial established a causative link between Ingersoll-Rand's compressors and Myra's mesothelioma, we find this assignment of error without merit.

The uncontradicted evidence established the compressor room at the Placid Oil facility housed ten compressors manufactured by Ingersoll-Rand. The corporate representative for Ingersoll-Rand, Gerald Swimmer, acknowledged in his deposition that the Ingersoll-Rand compressors contained asbestos material. Testimony established the compressors required asbestos insulation because in normal operation the turbo chargers and exhaust pipes on the compressor could reach temperatures in excess of one thousand degrees fahrenheit. Frank Parker, Plaintiffs' exposure expert, testified, at that time, the only available insulation was made of asbestos containing material.

5

Testimony established that the intense vibrations of the compressors while running caused the release of asbestos fibers and dust from the insulation into the air. The compressors ran continuously and the vibrations from the compressors could be felt before even entering the compressor room. Frank Parker stated the vibrations that occurred when the compressors were running was the main factor in asbestos dust and fibers being released into the air. He gave the following testimony at trial as to the enormity of the Ingersoll-Rand compressors and the dust that was emitted from them due to the vibrations:

> So these, these are big, you just, I mean you just gotta see them to believe them. And so anything like insulation, that type of thing on them is [going to] have tremendous vibrations and creates uh, very significant dust.

Part of Jimmy's duties required him to clean and sweep up the compressor room, which had the unintended effect of causing any settled asbestos fibers and dust to circulate back into the air while he was sweeping. Several witnesses, including Jimmy Williams, Sr., Bill Frazier and Frank Parker testified that the most obvious and likely cause for Myra's asbestos exposure was Jimmy's work in the compressor room. These witnesses all testified there was a constant level of asbestos dust in the compressor room that was actually visible to the naked eye in sunlight.

Ingersoll-Rand attempted to counter this testimony by maintaining the insulation on the compressors was covered with aluminum sleeves, which it argued prevented release of the asbestos fibers and dust. However, both Prentiss McLeod and Jimmy Williams, Sr. testified many of the turbo chargers and exhausts were not covered with aluminum sleeves. Most importantly, the great weight of the testimony, which the trial court accepted, established there was significant release of asbestos fibers and dust from the compressors.

6

Ingersoll-Rand complains in its brief that Plaintiffs have failed to establish an exact "dose" of exposure to asbestos. However, a plaintiff is not required to produce such proof to prevail in his/her action. As Plaintiffs point out, the court in *Robertson v. Doug Ashy Building Materials, Inc.*, 10-1547 (La.App. 1 Cir. 10/4/11), 77 So.3d 323, 336, *writ denied*, 11-2468 (La.1/13/12), 77 So.3d 972, addressed a similar argument, and stated, as follows:

> we cannot find, nor have we been directed to, any authority for the trial court's determination that a plaintiff must prove or that an expert must know the "dose" of asbestos as to each particular defendant in order to establish causation. Rather, based on our review of the jurisprudence, the plaintiff is only required to show "significant exposure to the [asbestos-containing] product complained of to the extent that it was a substantial factor in bringing about his injury." *Rando [v. Anco Insulations Inc.]*, 08-1163 at p. 35, 16 So.3d at 1091.

This standard of proof, developed by Louisiana courts over years of asbestos litigation, is known as the "substantial factor" test. *Rando v. Anco Insulations, Inc.*, 2008-1163, 2008-1169, p. 35 (La.5/22/09), 16 So.3d 1065, 1091. Thus, a plaintiff must prove, by a preponderance of the evidence that: (1) her exposure to the defendant's asbestos product was significant; and (2) that this exposure caused or was a substantial factor in bringing about her mesothelioma. *Id*.

The record was replete with evidence that Myra's mesothelioma arose from her exposure to asbestos while handling Jimmy's work clothes and riding in the family vehicle, which was Jimmy's transportation to and from work. Frank Parker, Plaintiff's exposure expert, was adamant in his belief that there was no way Myra could have handled Jimmy's clothing without suffering substantial exposure to asbestos.

Testimony by Ingersoll-Rand's corporate representatives, Gerald Swimmer and Victor Weintraub, reflected that Ingersoll-Rand was aware of potential asbestos problems as early as the 1950's. Frank Parker testified in the 1950's, in connection with its sales to the United States Naval Academy, Ingersoll-Rand

7

became aware of the potential health hazards caused by exposure to asbestos. By 1971, OSHA had identified asbestos as a Class 1 health hazard.

The record reflects Ingersoll-Rand was fully aware asbestos was a component part of its compressors. It also was aware of the potential health hazards from exposure to asbestos. Despite this knowledge, there was no testimony that Ingersoll-Rand warned any Placid Oil employees, including Jimmy Williams Sr., about these potential health hazards.

For the reasons set forth above, we find no error on the trial court's part in finding Myra's exposure to asbestos as a result of Jimmy's work with the Ingersoll-Rand compressors, was significant, and the exposure was a substantial factor in the development of her mesothelioma. This assignment of error is without merit.

## II. *Summary Judgment Dismissing J. Graves Insulation.*

In its second assignment of error, Ingersoll-Rand asserts the trial court erred by declaring, in a summary judgment, that J. Graves Insulation was not at fault and finding that the judgment was a final judgment.

Ingersoll-Rand alleges J. Graves was an insulation company that worked at the Placid Oil facility at certain times during the period in question. J. Graves was named as a party defendant in Plaintiffs' lawsuit. In response, J. Graves filed a motion for summary judgment. J. Graves supported its motion with sworn answers to interrogatories that it never "provide[d] asbestos-containing material to the Placid Oil facility." Jimmy Williams, Sr. testified he remembered J. Graves performed some insulation work on pipes at the Placid Oil facility, but did not know how often J. Graves was on site and testified there were other insulation companies who performed work there that he could not remember. J. Graves provided discovery responses that the only products sold or used by it at the Placid Oil facility were used only for insulation of cold processes. Thus, J. Graves

8

maintained it was not responsible for Myra being exposed to any asbestos-containing materials used or supplied by J. Graves.

J. Graves' motion was unopposed by any party, and was granted by the trial court pursuant to La.Code Civ.P. art. 966(G), dismissing Plaintiffs' claims against it with prejudice. No appellate review was sought by any party, including Ingersoll-Rand, from the trial court's judgment dismissing J. Graves. Despite this, Ingersoll-Rand questions the propriety of the summary judgment in its quest to have J. Graves cast with liability for a virile share of the damages awarded by the trial court. We find no merit in this argument, and find the motion for summary judgment granted in favor of J. Graves was a final and appealable judgment when rendered and signed. Ingersoll-Rand did not timely file an appeal attacking the correctness of that summary judgment and it is legally barred from doing so now.

Plaintiffs also accurately note, even absent the summary judgment, under the provisions of La.Civ.Code art. 2324 *at that time*, as a solidarily obligor, Ingersoll-Rand could be cast in judgment for the full amount, including that portion allocated to J. Graves, unless Plaintiffs settled with J. Graves.[2] Further, Ingersoll-Rand failed to introduce any evidence reflecting any work done by J. Graves at the Placid Oil facility, least of all any evidence that asbestos-containing material was actually installed or worked on by J. Graves.

### III.    *Survival Action.*

In this assignment of error, Ingersoll-Rand maintains the trial court erred in assigning 50% responsibility to Ingersoll-Rand Company in the survival action. After a review of the record and evidence adduced at trial, we find no error in the trial court's allocation of an equal virile share to both Ingersoll-Rand and Placid Oil.

---

[2] Ingersoll-Rand's right to contribution from J. Graves for its virile share would not affect Plaintiffs' judgment for the whole amount against it, unless as noted, Plaintiffs settled with J. Graves.

The Louisiana Supreme Court has held the current comparative fault law does not apply in asbestos exposure cases such as the instant one, where the substantial injury-producing exposures giving rise to plaintiffs' claims occurred prior to the August 1, 1980.[3] *Cole v. Celotex Corp.*, 599 So.2d 1058 (La.1992). The Louisiana Supreme Court in *Cole* explained the reasoning for this as follows:

> We conclude that the key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later. We further conclude that when the tortious exposures occurring before Act 431's effective date are significant and such exposures later result in the manifestation of damages, pre-Act law applies.

*Id.*, at 1066.

Ingersoll-Rand incorrectly argues that Placid Oil could have been assigned a greater percentage of fault. Pursuant to the law, pre-comparative fault law controls liability for the survival claims, and each liable defendant has an equal, virile share of the award provided to the plaintiffs. *Id.* As Plaintiffs note, Placid Oil was found strictly liable as the premise owner pursuant to La.Civ.Code art. 2317. At the time of Myra's exposures, La.Civ.Code art. 2317 did not require a finding of knowledge of the danger. Placid Oil was strictly liable solely because it was the premises owner. Under strict liability concepts, the mere fact of the premise owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. Thus, the trial court appropriately cast Placid Oil as liable for a single virile share for the survival damages awarded.

Ingersoll-Rand also ignores the applicable law in arguing its liability should be reduced because "for one third of the 21 years for which that sum was awarded, Ingersoll-Rand Company products had no causal role in his exposure." As

---

[3] The record is clear that Jimmy Williams, Sr. began working for Placid Oil in 1966, and worked as a compressor operator in the compressor room at the Placid Oil facility in the 1970's when he was exposed to asbestos. Thus, it is clear pre-comparative fault law applies.

Plaintiffs note, it is irrelevant whether or not exposure occurred and ended at different intervals in time. It is only relevant that the evidence established "significant exposure to the asbestos-containing product complained of to the extent that it was a substantial factor in bringing about [the] injury." *Rando*, 16 So.3d at 1091. As set forth above, the trial court did not err in finding Ingersoll-Rand's products were a substantial factor in bringing about Myra's mesothelioma; thus, Ingersoll-Rand is automatically responsible for an equal virile share under the law at the time of exposure.

Plaintiffs' note, at the time of Myra's exposure to asbestos, La.Civ.Code art. 2324 provided that a single solidary obligor could be compelled to pay the entire judgment. *Touchard v. Williams*, 617 So.2d 885 (La.1993). The underlying principal of solidary liability was to insure that the injured Plaintiff received full recovery. Under pre-1987 law, one solidary obligor could be obligated for the whole. *Id.* at 890. However, La.Civ.Code art. 2324 reserved to all parties their respective rights of indemnity and contribution. The trial court noted Ingersoll-Rand had the ability to seek a virile share reduction, but specifically found "Ingersoll-Rand failed to prove any other virile share liability." The trial court further stated "Ingersoll-Rand has the same obligation as the Plaintiff's [sic] to prove its case. They did not call any witnesses or introduce any evidence on the issue of Third Party Fault."

The trial court found, at most, Ingersoll-Rand only mentioned the involvement of several other entities, but did not prove any liability on their part in Myra's exposure to asbestos. "When a defendant urges the fault of a non-party, it is incumbent upon that defendant to provide evidence which preponderates that fault actually exists on the part of the non-party." *Joseph v. Broussard Rice Mill, Inc.*, 00-0628, p. 8-9 (La.10/30/00), 772 So.2d 94, 99, (citing *Terro v. Casualty Reciprocal Exch.*, 93-593 (La.App. 3 Cir. 2/2/94), 631 So.2d 651, *writ denied*, 94-

522 (La. 4/22/94), 637 So.2d 157); *Smith v. Jack Dyer & Associates*, 633 So.2d 694 (La.App. 1 Cir.1993).

The trial court also found, as to the survival action, the "only parties against whom any claim was proven is Placid Oil and Ingersoll-Rand." In its brief, Ingersoll-Rand argues the evidence below established fault on six other entities.[4]

Initially, we note Garlock, Flexitallic and Pittsburgh-Corning (three of the six entities specifically named by Ingersoll-Rand), had been previously adjudged bankrupt. Applying La.Civ.Code art. 2324, as written at the time of the substantial exposure, a non-settling solidary defendant cannot reduce its liability through the insolvency of a co-defendant.

Thus, along with finding Ingersoll-Rand failed to provide any evidence of these parties' fault, the trial court correctly found the applicable law at the time of Myra's exposure did not allow a virile share offset or credit for the alleged liability of the entities listed to reduce Ingersoll-Rand's responsibility for payment of the judgment. Moreover, we also find no error in the trial court's finding that Ingersoll-Rand failed to provide any evidence as to any of the other specified parties' alleged fault, and note as well that the judgment dismissing J. Graves is final. The record did not establish sufficient proof of any negligence on the part of Hudson Engineering. While the record did establish Hudson built the buildings at the Placid Oil facility, there was no mention of asbestos. Prentiss McCloud testified that Hudson insulated the compressors as per the instruction of Ingersoll-Rand. Ingersoll-Rand's arguments as to Shreveport Rubber & Gasket are indicative of the lack of evidence established at trial. In its appellate brief, when briefly discussing Shreveport Rubber, Ingersoll-Rand states it was a "provider of

---

[4] The six entities listed by Ingersoll-Rand are as follows: Garlock (a manufacturer and seller of gaskets), Flexitallic (a manufacturer and seller of gaskets), Pittsburgh-Corning Corporation (a manufacturer of Unibestos, which is an asbestos insulation product which Ingersoll-Rand claims was present in the compressor room), Shreveport Rubber & Gasket Co. (a provider of gaskets from which Ingersoll-Rand claims Placid Oil personnel made their own gaskets), J. Graves Insulation Co. (an alleged installer of asbestos insulation) and Hudson Engineers (which built a great deal of the Placid Oil facility).

gaskets or of asbestos sheets from which Placid personnel made their own gaskets." In support of that claim, Ingersoll-Rand cites the following testimony of Jimmy Williams, Sr.:

> Q. Okay. Did you ever hear of a company called Shreveport Rubber and Gasket?
>
> A. Yes sir.
>
> Q. Uh, and isn't it true that Placid bought their gaskets or some of their gaskets from Shreveport Rubber and Gasket?
>
> A. I'm sure they did. They were a supplier of it.

This was the entirety of the testimony cited by Ingersoll-Rand that referred to Shreveport Rubber & Gasket. Although Mr. Williams testified they likely supplied gaskets, it was not stated they supplied asbestos gaskets nor was there any mention of Shreveport Rubber & Gasket supplying asbestos sheets. There also is no mention of what Shreveport Rubber & Gasket may have known or failed to do. Simply because Shreveport Rubber & Gasket settled with Plaintiffs does not meet Ingersoll-Rand's burden of proof

As noted by the trial court, the appellate court in *Roberts v. Owens-Corning Fiberglas Corp.*, 03-248, p.14 (La.App. 1 Cir. 4/2/04), 878 So.2d 631, 642, discussed the burden a non-settling defendant must meet to find negligence on third parties:

> Exxon correctly contends, and as Roberts' experts stated, that any exposure or inhalation, of a respirable fiber, may cause lung disease. But our courts have, as a matter of policy, required that "the claimant must show that he had a significant exposure to the product complained of to the extent that it was a substantial factor in bringing about injury." *Bordelon*, 96-0525 at p. 30, 726 So.2d at 948, cited in *Abadie*, 00-344, 00-856 at p. 90, 784 So.2d at 65. The court in *Abadie* was very clear that a non-settling defendant must prove, not only that a settling defendant manufactured an asbestos-containing product, but also that the products were used in such a manner that dust was emitted. Evidence of the mere physical presence of asbestos-containing material is insufficient to find a manufacturer liable to a plaintiff. *Abadie*, 00-344, 00-856 at p. 92, 784 So.2d at 67.

Based on our review of the record, the trial court's finding that no other entity besides Ingersoll-Rand and Placid Oil was at fault in the survival action is not manifestly erroneous. The record is void of the required evidence for Ingersoll-Rand to meet its burden of proof on this issue.

## IV.    *Wrongful Death Action.*

Ingersoll-Rand argues in this assignment of error that the trial court erred in assigning 100% responsibility to it in the wrongful death action. Ingersoll-Rand argues in its brief that the "liability determination in a survival action and a wrongful death action is the same in every case unless the death did not result from the same cause that produced the injuries in the survival action." As Plaintiffs note, this assertion is wholly without merit.

The Louisiana Supreme Court in *Walls v. American Optical Corp.*, 98-0455 (La. 9/8/99), 740 So.2d 1262, addressed this issue. In *Walls*, the supreme court addressed whether the 1976 amendment to La.R.S. 23:1032, which provided for executive officer immunity, applied to a wrongful death claim where the decedent's death from silicosis, contracted as a result of occupational exposure to silica dust, occurred well after the amendment's effective date, but his exposure to the hazardous substance occurred prior to the amendment. The plaintiffs in *Walls* argued that the exposure theory in *Cole*, 599 So.2d 1058, should apply to their wrongful death claim, arguing that *Cole* requires all long-latency occupational lung disease cases to be governed by the law in effect on the date the victim was exposed to the disease causing agent.

The court in *Walls* rejected this argument, stating that "Cole should not be read so expansively." *Walls*, 740 So.2d at 1270. In doing so, the supreme court explained that *Cole* involved a direct tort action, which, like all other actions, accrues upon the existence of both wrongful conduct and an injury. In long-latency disease cases, where the relevant injury is the victim's disease, determining

14

the exact moment of injury is virtually impossible. However, the court in *Walls* recognized that a different situation exists when the cause of action is one for wrongful death:

> While we acknowledge the factual similarities between Cole and the instant case, we find the distinguishing factors dispositive, and reject the plaintiffs' contention that Cole's "tortious exposure doctrine" applies to determine the applicable law in the instant case.

*Id.* at 1271. After distinguishing *Cole* on the ground that the 1976 amendment to La.R.S. 23:1032 was not at issue in that case, which turned on the distinct language of Act 431 and the legislative intent expressed therein, the supreme court explained:

> [T]he instant case does not involve a direct tort action or a survival action, such as gave rise to Cole, but instead presents an action for wrongful death. In Louisiana, it is well established that the survival action and the wrongful death action are two different causes of action that arise at different times.

Noting that the survival action and the wrongful death action are totally separate and distinct causes of action that arise at different times and allow recovery of completely different damages, the court concluded that although "*Cole* established the 'exposure theory' for determining the applicable law within the context of the direct tort action and survival action . . . *Cole's* rationale cannot apply to the instant case involving a wholly distinct cause of action for wrongful death." *Walls*, 740 So.2d at 1273. Thus, the supreme court determined with regard to the wrongful death cause of action in long-term exposure cases, the law to be applied is the law in existence at the time of death.

The trial court correctly noted "[t]he wrongful death claim's determined by the law at the time of death as differentiated from the survival claim determined by law at the time of the exposure." The trial court also stated Ingersoll-Rand "is entitled to no additional percentage reduction absent proving it was more likely that not the fault of others."

15

The trial court found Placid Oil was not at fault in the wrongful death claim as Ingersoll-Rand produced no evidence of any actual or constructive knowledge of Placid concerning any asbestos related dangers at its facility. As we discussed in relation to the survival action, under the version of La.Civ.Code art. 2317 in existence at the time of Myra's substantial exposure to asbestos, there was no requirement that the premise owner have actual or constructive knowledge to impose strict liability.

However, in 2004, when Myra died, changes had been made to La.Civ.Code art. 2317 and La.Civ.Code art. 2317.1 applied. In relevant part, La.Civ.Code 2317.1 read as follows:

> The owner or custodian of a thing is answerable per damages occasioned by its ruin, vice or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care and that he failed to exercise reasonable care.

The trial court found Placid Oil strictly liable in the survival action solely based on its capacity as the premise owner, not an employer. Ingersoll-Rand failed to introduce any evidence of actual or constructive knowledge on Placid Oil's part concerning any asbestos dangers posed by Ingersoll-Rand's compressors to its employees. There was also no evidence that Ingersoll-Rand ever placed Placid Oil on notice of any potential hazards from working around its compressors.

Ingersoll-Rand cites the case of *Warren v. Sabine Towing and Transp. Co., Inc.*, 01-573 (La.App. 3 Cir. 10/30/02), 831 So.2d 517, *writs denied*, 02-2926, 02-2927, 02-2936 (La. 2/14/03), 836 So.2d 116, 117, as supportive of its position that its apportionment of fault should be reduced in the wrongful death claim. In *Warren*, a survival action and wrongful death action were tried over the decedent's battle with acute myelogenous leukemia as a result of alleged exposure to benzene during his employment. After a bench trial, the trial court assigned 33% fault to

16

the employer and the balance to other entities in the survival action. In the wrongful death action, no fault was assigned to the employer. This court reversed and found the employer liable for 40% fault in both the survival action and wrongful death action.

Ingersoll-Rand asserts this case supports its position that "there is nothing in the record to support a different allocation of responsibility in the wrongful death action from that found in the survival action." We disagree, and find the *Warren* case is distinguishable from the present case. Importantly, both the survival action and wrongful death action in *Warren* were determined based upon a comparative fault system. Thus, the basis for our reversal in *Warren* is not present in the facts before us today. The survival action in this case is based on pre-comparative fault law and the wrongful death action is based on comparative fault. Thus, *Warren* is not analogous to the instant case.

After a thorough review of the record and applicable law, we find the trial court did not abuse its discretion in assessing one hundred percent fault in the wrongful death action to Ingersoll-Rand. As discussed above, Ingersoll-Rand failed to produce evidence at trial to establish fault on the part of any other entities.

## V. *Wrongful Death Damage Awards.*

In its final assignment of error, Ingersoll-Rand asserts the $750,000.00 award to each of Myra's children for their individual wrongful death action was excessive. Ingersoll-Rand does not challenge the trial court's award of $1,000,000.00 to Jimmy Williams, Sr.

This court in *Raymond v. Government Employees Ins. Co.*, 09-1327, p. 3 (La.App. 3 Cir. 6/2/10), 40 So.3d 1179, 1190-91, *writ denied*, 10-1569 (La.10/08/10), 46 So.3d 1268, this court discussed the appellate review of damages:

17

The supreme court recently reiterated the principles of appellate review of damages in *Guillory v. Lee*, 09-75, pp. 14-16 (La. 6/26/09), 16 So.3d 1104, 1116-1118:

It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. Louisiana Civil Code article 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. *Wainwright v. Fontenot*, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. This court has noted:

[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

*Perkins v. Entergy Corp.*, 00-1372 (La.3/23/01), 782 So.2d 606, *reh'g denied*, 4/27/01 (quoting *Canter v. Koehring*, 283 So.2d 716, 724 (La.1973)) (superseded by statute on other grounds ). Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. *Youn v. Maritime Overseas Corp., et al.*, 623 So.2d 1257, 1261 (La.1993), *reh'g denied*, 10/7/93.

The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. This court has long held true to the following principle:

[b]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

> *Wainwright*, 00-0492, p. 6, 774 So.2d at 74 (quoting *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted)).  See also *Miller v. Lammico*, 07-1352, p. 28 (La.1/16/08), 973 So.2d 693, 711 (stating that an appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion and citing *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La.1993)); *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993); *Reck v. Stevens*, 373 So.2d 498, 501 (La.1979).  Furthermore, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.  *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.  *Id*. (citing *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978) and *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So.2d 967 (La.1985)).  Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.  *Perkins*, 782 So.2d at 612 (citing *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221).  Reasonable persons frequently disagree about the measure of damages in a particular case.  "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."  *Youn*, 623 So.2d at 1261.

Specifically, wrongful death claims are meant to compensate the survivors designated by La.Civ.Code art. 2315.2 for their own injuries arising from the loss of the decedent.  "The elements to consider in making an award of wrongful death damages include loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses."  *Raymond*, 40 So.3d 1191, citing *Smith v. Municipality of Ferriday*, 05-755 (La.App. 3 Cir. 2/1/06), 922 So.2d 1222, *writ denied*, 06-934 (La.9/29/06), 937 So.2d 860.

Ingersoll-Rand's main objection to the amounts awarded to each of the Williams' children is that they were adults at the time of Myra's death and not minor children.  Thus, Ingersoll-Rand argues the $750,000.00 wrongful death damage awards made to the two minor children in *Raymond*, 40 So.3d 1179, and

19

the $2,500,000.00 wrongful death award made to a ten year old child for the death of her mother in *Rachal v. Brouillette*, 12-794 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, *writ denied*, 13-690 (La.5/3/13), 113 So.3d 217, are distinguishable based on that factor. While we agree awards given to minor children for the wrongful death of a parent are typically higher than those given to adult children, that factor alone does not necessarily render the awards in this case excessive.

All four children, as well as several other witnesses, testified that Myra was the center of the Williams' family. All family events and holiday gatherings were usually held at Myra and Jimmy's. The children testified that family gatherings and even holidays together were much less frequent following Myra's death. Both Williams' daughters testified that Mother's Day, which in the past was a cause for celebration, was now an extremely difficult day to endure.

Each child testified, in heartbreaking detail, regarding the loss they suffered as a result of their mother's death. The record was clear that Myra's last few months were extremely painful as tumors ravaged her body, breaking through her rib cage and encasing her heart. Each child testified as to the difficulty of watching their mother go from an energetic, healthy woman to someone bedridden and in such excruciating pain that even Oxycontin provided no relief.

Each child also testified as to the extremely close relationship they had with Myra. Both daughters testified they spoke with their mother every day either in person or on the phone. Jimmy Williams, Jr., the oldest child, testified even on the occasions when he was out of town working, he tried to call his mother every day. When his mother became incapacitated due to her illness, Jimmy Jr. stopped working and stayed home to care for her. He also stated he promised his mother he would take care of his father after her death.

The facts in this case are especially tragic. As a result of their mother's battle with mesothelioma, the Williams' children were forced to witness her

extremely painful and debilitating final few months before she lost her life. The children were devastated by her death, and despite the trial being many years after Myra's death, their testimony indicated those feelings of loss were still palpable.

This court in *Mathieu v. State, Department of Transportation and Development*, 598 So.2d 676, 682 (La.App. 3 Cir.), *writ denied*, 600 So.2d 665 (La.1992), noted that "Louisiana courts have often upheld large wrongful death awards as reasonable in cases where the decedent and the surviving spouse and minor children had extraordinarily close and loving relationships." The fact that the children in this case were adults does not negate the fact that this was an extremely close and loving family that was devastated by Myra's death.

After a thorough review of the record, although we find the awards rendered to the Williams' children may be on the high side, we cannot say the trial court abused its vast discretion in rendering each child $750,000.00 as wrongful death damages. Therefore, we will not disturb the trial court's awards.

## VI. *Legal Interest.*

Although not listed as an assignment of error in its original brief, a lengthy portion of Ingersoll-Rand's reply brief focuses on the fact the trial court's judgment did not specifically address legal interest. However, as Plaintiffs note, although not mentioned in the trial court's judgment, the trial court obviously recognized the accrual of interest during the hearing when it raised Ingersoll-Rand's suspensive appeal bond from $5,500,000.00 (the amount of all awards against Ingersoll-Rand) to $9,200,703.55. This was done pursuant to Plaintiffs' challenge of the sufficiency of the appeal bond. Ingersoll-Rand complied with the trial court's ruling and did not pursue any writ with this court on that issue.

Ingersoll-Rand's comments in its reply brief that the judgment did not award judicial interest attempts to interject an issue not properly raised here. We take liberty to note, however, when a judgment does not specifically state the words

21

"with interest from judicial demand," such interest is automatically assessed against the defendants by "operation of law." Louisiana Revised Statutes 13:4203 states "[l]egal interest **shall** attach from date of judicial demand on all judgments sounding in damages 'ex delicto' which may be rendered by any of the courts." (Emphasis added.) The courts of this state have long held the "attachment" occurs by operation of law even if the court fails to include language in the judgment saying so. As this court specifically found in *Duplechain v. Jalili*, 10-736 (La. App. 3 Cir. 12/8/10) 52 So. 3d 1072, 1077, *writ denied*, 61 So. 3d 664 (La. 3/25/11), "[l]egal interest on judgments for damages in tort cases is an operation of law. The interest attaches automatically until the judgment is paid regardless of whether it was prayed for in the petition or mentioned in the judgment." Therefore, the fact the judgment did not specifically address legal interest is of no moment as legal interest attaches by operation of law.

## DECREE

For the foregoing reasons, the judgment of the lower court is affirmed in all respects. All costs of this appeal are assessed to defendant-appellant, Ingersoll-Rand Company.

**AFFIRMED.**

JIMMY WILLIAMS, SR., ET AL.

VERSUS

PLACID OIL COMPANY, ET AL.

**Conery, J., concurs in part, dissents in part, and assigns reasons.**

I concur with the majority's opinion affirming fault at 50% to Placid Oil and 50% to Ingersoll-Rand in the survival action. I respectfully dissent from the majority's decision to assess 100% fault to Ingersoll-Rand in the wrongful death action. The evidence is clear that Myra Williams died from mesothelioma in 2003 caused by contact with asbestos from her husband's work clothes while he worked for Placid Oil. I agree with the reasoning of astute counsel for Ingersoll-Rand that Mrs. Williams' death was caused by the fault of both Ingersoll-Rand and Placid Oil. If the fault of Placid Oil was a substantial factor causing Myra Williams to contract mesothelioma, suffer, and die for purposes of her survival action, then the trial court has already adjudicated causation and a 50% virile share reduction for purposes of the wrongful death action should be assessed as well.

I understand able counsel for plaintiffs' argument that the wrongful death action is separate from the survival action and that for purposes of the survival action, the law that applies is the law at the time of asbestos exposure.[5] Placid Oil's virile share in the survival action was based on strict liability under La.Civ.Code art. 2317 as the owner of premises causing its workers to be exposed to ultra-hazardous substances, in this case, asbestos, primarily from Mr. Williams' exposure to asbestos in the compressor room in the mid 1970s. The law at the time

---

[5]*Landry v. Avondale Industries, Inc.*, 03-3432 (La. 7/2/04), 877 So.2d 970.

23

of exposure in the 1970s had no requirement that proof of Placid Oil's actual or constructive knowledge of the hazard was necessary in order to recover survival damages under La.Civ.Code art. 2317.

I also agree that the law in effect at the time of death applies to the wrongful death action.[6] Mrs. Williams died in 2003. Louisiana Civil Code Article 2317 was amended in 1996 to add a negligence standard requiring, in this case, proof by a preponderance of the evidence that Placid Oil as the plant owner/operator/ employer **knew or should have known** of the ruin, vice, or defect which caused the damages and that Placid failed to exercise reasonable care to prevent the damage. La.Civ.Code art. 2317.l.[7] Plaintiffs specifically plead and proved at trial that Placid Oil was the owner and operator of the oil and gas refinery and processing facility in question, was the employer of Mr. Williams, and knew or should have known of the hazardous exposure of its workers to asbestos, and took no steps to warn or protect its employees and their families. Now, for the first time on appeal, plaintiffs argue that somehow Placid Oil's virile share responsibility in the wrongful death action should be eliminated.

Mr. Williams was undeniably exposed to asbestos from Placid Oil's compressors in Placid Oil's compressor room where ten massive Ingersoll-Rand compressors with seventeen (17) turbo chargers insulated with asbestos were located. Yet the trial judge failed to make any specific findings or even discuss Placid Oil's liability for wrongful death damages under La.Civ.Code art. 2317.1 as amended and in effect at the time of Mrs. Williams' death in 2003 in its reasons for judgment, stating only, **"Therefore, the Court finds that the only party at fault**

---

[6] *See Landry,* 877 So.2d 970; *Walls v. American Optical Corp.,* 98-0455 (La. 9/8/99), 740 So.2d 1262.

[7] Damage caused by ruin, vice, or defect in things. The owner or custodian of a thing is answerable for damages occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. Added by Acts 1996, 1st Ex.Sess., No. 1, § 1, eff. April 16, 1996.

**in causing Myra Williams mesothelioma is Ingersoll-Rand. Ingersoll-Rand had a responsibility to provide adequate warnings and to recognize inherent dangers, but Ingersoll-Rand did nothing."** (Emphasis added.) This after the trial court had just found that Placid Oil was 50% at fault in causing Mrs. Williams to contract mesothelioma and awarded Mr. Williams and the four adult children damages of $3,000,000.00 for her pre-death suffering in the survival action.

I would submit that as Mr. Williams' employer and owner of the oil refinery and plant facilities, Placid Oil had an even greater duty than Ingersoll-Rand, who sold the compressors to Placid, to warn and protect its employees, as it clearly had direct knowledge of the hazards and dangers of asbestos exposure in the compressor room. As a "sophisticated user"[8] of the known asbestos containing components at its plant, Placid Oil knew or should have known of the potential for secondary exposure from asbestos on its employees' work clothes, had a specific duty to warn and protect against such hazardous exposure, and did nothing.

In exonerating Placid of any liability in the wrongful death action, the majority opinion concludes, "Ingersoll-Rand failed to introduce **any** evidence of actual or constructive knowledge on Placid Oil's part concerning any asbestos dangers posed by Ingersoll-Rand's compressors to its employees." (Emphasis added). The evidence in the record shows just the opposite. The record is replete with **uncontradicted** evidence of Placid Oil's fault. Indeed, plaintiffs made specific allegations of Placid Oil's fault and negligence in their detailed petition,[9] and then went on to introduce uncontradicted evidence at trial in support of those allegations. Almost all the evidence on this issue came from plaintiffs' own experts and witnesses.

---

[8] A sophisticated user is defined as one who is "familiar with the product," *Hines v. Remington Arms Co., Ind.,* 94-455, p. 10 (La. 12/8/94), 648 So.2d 331, 337, or as one who "possesses more than a general knowledge of the product and how it is used." *Asbestos v. Bordelon, Inc.,* 96-525, p. 44 (La.App. 4 Cir. 10/21/98), 726 So.2d 926, 955. As a result of their familiarity with a product, sophisticated users are presumed to know the dangers presented by the product; hence, there is no duty to warn them. *Hines,* 648 So.2d 331.

[9]*See* plaintiffs' petition paragraphs 17-24.

25

As an intermediate appellate court, our duty is to review the evidence in the entire record under the manifest error, clearly wrong standard. *Hayes Fund for the United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), 193 So.3d 1110. In *Hayes*, the supreme court offered clear guidance as to the role of the appellate court in a manifest error review. Great deference is to be given to the trial judge's factual findings. We are cautioned not to re-weigh the evidence and "where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly wrong." *Hayes*, 193 So.3d at p. 1116. However, here the trial judge made no "credibility decisions," did not "weigh the evidence," and did not make a "conscious choice between two permissible views of the evidence" on the issue of whether Placid Oil "knew or should have known" of the asbestos exposure to its workers at its facility and failed to exercise reasonable care to protect its workers and their families, as was its duty under the law. La.Civ.Code art. 2317.1; *Hayes*, 193 So.3d at p. 1116. Based on a review of the entire record, I would find that the trial judge was "manifestly erroneous" and "clearly wrong" in failing to apply the uncontradicted and unrebutted evidence in the record and find that Placid Oil "knew or should have known" of the asbestos exposure to its workers, and yet failed to take any steps to protect or warn its employees and their families, specifically Jimmy Williams, Sr. and Myra Williams, his wife.

The deposition testimony of Prentiss McLeod, previously identified as a Placid Oil superintendent at the time Mr. Williams worked in Placid Oil's compressor room in the mid 1970s, conclusively establishes that Placid Oil had knowledge that insulation around the turbo chargers on each of Ingersoll-Rand's ten compressors contained asbestos, that each compressor had almost thirty gaskets made of asbestos, and that exposure to asbestos was hazardous. Mr. McLeod

26

testified, "**Those ten engines we had in the plant, those Ingersoll-Rands, had asbestos on the turbo chargers and the exhaust piping.**"

He went on to testify:

> Q  Okay.  You said a couple of times that that was asbestos insulation.
>
> A  Yes.
>
> Q  How do you know that?  I'm not saying you're wrong - -
>
> A  Right, at that time, asbestos was all you got for hot temperature.  I'm talking about back in the mid to late 1960's.

Mr. McLeod also confirmed that as early as the 1970s, Placid Oil was aware of the Occupational Safety and Health Administration (OSHA) regulations concerning asbestos exposure:

> Q  You were aware that OSHA has regulations for handling asbestos
>
> A  Yes.
>
> Q  When did you first become aware of that?
>
> A  Oh, at one of our safety meetings back before that addition out there.  I'd say probably the late 1970's.  It might have been a little before then.  It couldn't have been much before then.
>
> Q  Was it part of your job, whatever it was, whenever you learned about the - - because you've been Superintendent out there, whenever you learned about asbestos regulations, was part of your job to see that the workers followed these regulations?
>
> A  Right.
>
> Q  It was?
>
> A  Right.  And do not touch anything with asbestos on it, you know, without proper clearance, and et cetera.

The trial judge made a specific factual finding that "Prentice McLeod was the superintendent while Mr. Williams, Sr., was a compressor operator.  McLeod described the compressors as having almost thirty gaskets on each compressor that were made of asbestos."  Mr. Williams was exposed to asbestos from the asbestos

27

insulation around the turbo chargers on the compressors and was further exposed when the asbestos gaskets were changed. The trial court's written reasons go on to state its clear factual finding that "McLeod knew that the insulation used on the compressors contained asbestos."

Mr. Williams' unrebutted testimony confirmed that there were seventeen (17) turbo chargers on the compressors and that the exhaust on each was insulated with asbestos. No warnings about asbestos hazards were provided to him by either Ingersoll-Rand or Placid Oil:

> Q. Did anyone tell you that asbestos was hazardous?
>
> A. Not that I remember.
>
> Q. Either Ingersoll-Rand or Placid?
>
> A. Neither one.
>
> Q. Did anyone ever tell you that the uh, that when you were handling asbestos it was creating dust and that dust was hazardous?
>
> A. No sir.

Dr. Victor Roggli, the plaintiffs' world renowned expert in pathology with particular expert knowledge of the effect of asbestos on the human body, testified that in 1970 OSHA enacted an "emergency act" to warn everyone about the dangers of asbestos exposure. Congress enacted enabling legislation in 1971. Oil and gas refineries and facilities such as Placid Oil had a non-delegable duty to protect their employees from asbestos exposure and follow the law as adopted by congress. Among those OSHA regulations were the requirements that employers monitor asbestos exposure and require that work clothes be segregated in order to prevent contaminated work clothes from being taken home, the exact situation which caused Mrs. Williams to contract mesothelioma from the asbestos on her husband's work clothes.

28

Uncontradicted testimony at trial established that Mr. Williams worked for Placid Oil from 1966–1995, and worked in the compressor room in the mid 1970s, approximately 1973–1978, with constant exposure to asbestos dust and fibers from the insulation around Ingersoll-Rand compressors. Mr. Williams, as well as several other witnesses, testified that the huge compressors vibrated and asbestos dust from the compressors was clearly visible in the air in the area where Mr. Williams was working. In fact, one of Mr. Williams' jobs was to sweep and clean up the dust, causing the fibers to once again become airborne, according to the uncontradicted evidence at trial. Dr. Roggli confirmed that the presence of visible asbestos fibers in the air meant that concentrations of asbestos exceeded all safety standards. Yet Placid failed completely to provide monitors, provide warnings and protect its workers. Neither Mr. McLeod, Mr. Williams' supervisor, nor anyone else at Placid Oil informed Mr. Williams of the dangers of asbestos exposure or the dangers of secondary exposure until after Mrs. Williams became ill and was diagnosed with mesothelioma.

Mr. Frank Parker, III, the plaintiffs' own expert in the field of industrial hygiene, also discussed the employer's non-delegable duties under the Walsh Healey Act adopted in the 1950s and OSHA regulations adopted in 1970. He further testified that in 1952 the Louisiana Legislature recognized the potential dangers of asbestos exposure and made asbestosis a compensable claim under the Louisiana Worker's Compensation Act. Especially in light of the change in the law governing worker's compensation and the OSHA regulations requiring compliance by employers whose employees were exposed to asbestos, Placid Oil had a duty to know and at the very least **should have known** of the dangers of asbestos exposure, both as an employer as well as the owner/operator of an oil and gas refinery and facility known to contain asbestos. Yet no notice, warnings or proper procedures were put in place to protect Placid Oil's workers or their

29

families. Placid Oil was certainly a "sophisticated user" of the machinery at its plant, having participated in the design and construction of the plant, including specifically the placement and use of the large Ingersoll-Rand compressors that were vital to the plant's operation, with seventeen (17) turbo chargers insulated with asbestos and with thirty asbestos gaskets on each.

The testimony of Mr. Bill Frazier, plaintiff's coworker who worked for Placid Oil from 1967 until about 1980, confirmed that he and the other workers were never warned by Placid Oil of the known dangers of asbestos exposure at any formal safety meetings or otherwise. Mr. McLeod, the supervisor in charge, made that point clear in his testimony. Though required by OSHA regulations, Placid Oil workers were not issued company coveralls or uniforms and wore their own clothes to work and back home after work. The workers were never instructed that they should change their clothes or take showers before leaving work at the Placid Oil facility. The levels of asbestos exposure were never monitored by either workers or supervisors, and the workers were never issued or told to wear respirators when working around asbestos insulation. No warnings were given to family members of the workers about the potential for secondary asbestos exposure from the employees and their work clothes.

Mr. Williams testified in like manner at trial, as did Jimmy Williams, Jr. The evidence was uncontradicted that Mrs. Williams personally laundered all of her husband's work clothes and was given no warnings whatsoever by Placid Oil.

Ingersoll-Rand cites *Warren v. Sabine Towing and Transp. Co., Inc.*, 01-573 (La.App. 3 Cir. 10/30/02), 831 So.2d 517, *writs denied*, 02-2926, 02-2927, 02-2936 (La. 2/14/03), 836 So.2d 116, 117, as supportive of its position that its apportionment of fault should be reduced to no more than 50% in the wrongful death claim. In *Warren*, as in this case, a survival action and wrongful death action were tried over the decedent's battle with acute myelogenous leukemia as a result

30

of alleged exposure to benzene during his employment. After a bench trial, the trial court assigned 33% fault to the employer and the balance to other entities in the survival action. In the wrongful death action, **no fault was assigned to the employer**. In a well-reasoned decision, this court reversed and found the employer liable for **40% of fault in both the survival action and wrongful death action.**

Louisiana Civil Code article 2323(A) governs the application of comparative fault for a wrongful death claim and states:

> A. In any action for damages where a person suffers injury, death, or loss, the **degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined,** regardless of **whether the person is a party to the action or a nonparty, and regardless of the person's insolvency,** ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss. (Emphasis added.)

Placid Oil should be assigned a fifty (50%) percent virile share of the fault in the wrongful death action and it was manifestly erroneous for the trial judge to fail to do so. Based on the entire record before us, the evidence is clear and it is uncontradicted, having come from plaintiffs' own experts and witnesses, that Placid Oil had the requisite actual knowledge of the dangers of asbestos exposure to Mr. Williams, especially in the compressor room, failed to exercise reasonable care to prevent Mr. Williams and his spouse from hazardous exposure to asbestos, and thus should be held liable for a 50% virile share of the wrongful death damages, along with Ingersoll-Rand, pursuant to La.Civ.Code art. 2317.1. At the very least, Placid Oil "should have known" of the asbestos hazards and did nothing to warn its employees and their families. Since Placid Oil has been released in

31

bankruptcy,[10] its virile share of liability must be offset in the judgment against Ingersoll-Rand under La.Civ.Code art. 2323(a), just as was done in the survival action.

## QUANTUM

The quantum awards in this case are likewise reviewed under the manifest error "clear abuse of discretion" standard as stated in the Louisiana Supreme Court decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, (La. 1993), and *Hayes*, 193 So.3d 1110. Ingersoll-Rand also appealed the trial judge's decision to award each of the four adult children of Myra Williams $750,000.00 in wrongful death damages for the loss of their mother.[11] Ingersoll-Rand did not appeal the amount of the $3,000,000.00 survival damages award brought by Mr. Williams and the adult children for Myra Williams' pre-death suffering, or the amount of the $1,000,000.00 wrongful death award to Mr. Williams.

I would find that the $750,000.00 wrongful death award to each of the adult children is manifestly erroneous, especially in light of the generous survival action damages which Mr. Williams and the four children inherited after Ms. Williams' death. The wrongful death award to the adult children is three times the average award in cases of this type, as discussed in detail in Ingersoll-Rand's brief.[12] While I agree with plaintiffs' counsel that damages should be set individually and not by simply reviewing "average" awards, and that many of the awards in the $250,000.00 range for wrongful death damages for adult children are somewhat dated and would be higher in today's dollars, I would find that awarding damages

---

[10]*In Re Placid Oil Co.* Bankruptcy No. 86-33419-SGJ-11. Adversary No. 09-03356-SGJ. 463 B.R. 803 (2012).

[11]Mrs. Williams was 59 when she died on August 9, 2003. The names and ages of her adult children when she died were: Jimmy Sloan Williams, age 40, Dalton Glen Williams, age 37, Jeanette Williams Shows, age 35, and Gwen Williams Hernandez, age 26.

[12]*See e.g., Thomas v. A.P. Green Indus. Inc.,* 2005-1064 (La.App. 4 Cir. 5/31/06), 933 So.2d 843; *Roberts v. Owens-Fiberglass*, 2003-0248 (La.App. 1 Cir. 4/2/04), 878 So. 2d 631; *Mathieu v. DOTD*, 598 So.2d 676 (La.App. 3 Cir. 1992); *Warren v. Sabine Towing*, 2001-0573 (La.App. 3 Cir. 10/30/02), 831 So.2d 517; *Talbert v. Evans*, 2011-1096 (La.App. 4 Cir. 3/7/12); 88 So.3d 673.

to adult children by a factor of three times the average of most previous awards affirmed in the jurisprudence is a leap too far and too fast.

I agree with counsel for Ingersoll-Rand that the adult children cannot recover for their own mental anguish as they watched their mother suffer and die. The adult children have no right under the law to sue for such a claim, absent circumstances not present here.[13] Much of their trial testimony focused on that issue. As previously stated, the adult children have already inherited, along with their father, the generous $3,000,000.00 survival damage claim of their mother for her own pre-death suffering.

The wrongful death claim accrues at the moment of death and is intended to compensate for the suffering of the named beneficiaries after the decedent's death.[14] In its reasons for judgment on the issue of the adult children's' wrongful death damages, the trial judge said only:

> Every child testified that Ms. Williams was the center of their universe. She woke them each morning with a cup of coffee and a smile while growing up. She was there when their children were born. She kept her grandchildren every day. She cooked supper every night and everyone congregated at her home even after they were grown and had moved out. The court awards each child $750,000.00 for the wrongful death of their mother.

The elements of damages in the wrongful death claim at issue here are loss of love and affection, companionship, guidance and loss of services.[15] Funeral expenses are recoverable but were not mentioned by the trial court and do not appear to be an issue on appeal.

While I agree with esteemed counsel for plaintiffs that these adult children each had a very close and loving relationship with their mother and are entitled to a fair and just award, I would find that the award of $750,000.00 to each in this case

---

[13]La.Civ.Code art. 2315.6.

[14]*Barbara Raymond v. Gov. Employees Ins. Co.*, 09-1327 (La.App. 3 Cir. 6/2/10), 40 So.3d 1179, *writ denied*, 10-1569 (La. 10/8/10), 46 So.3d 1268.

[15] *Wanda Baker Smith, et al. v. The Municipality of Ferriday*, 05-755 (La.App. 3 Cir. 2/1/06), 922 So.2d 1222, *writ denied*, 06-934 (La. 9/29/06), 937 So.2d 860.

is unreasonably high, is not supported by the record and is manifestly erroneous. While respecting the enormity of their loss and the emotional pain each continues to experience, after reviewing the entirety of the testimony of each, as well as all the evidence in the record on this issue, I would hold that the highest award that is reasonably supported by the evidence in the record is $500,000.00 to each of the adult children.[16]

## CONCLUSION

I would affirm the trial judge's finding that Ingersoll-Rand and Placid Oil are each 50% at fault in the survival claim, and that Ingersoll-Rand is entitled to a virile share credit for Placid Oil's fault in the survival action. I would reverse the trial judge in the wrongful death claim and assess a 50% virile share fault to Placid Oil and 50% virile share to Ingersoll-Rand in the wrongful death claim. I would reduce the quantum award in the wrongful death claim to $500,000.00 to each of the four adult children. I would assess 50% of the costs of appeal to plaintiffs and 50% to Ingersoll-Rand. In all other respects, I would concur with the majority to affirm the trial judge's decision.

---

[16]In *Chaisson v. Avondale Indus., Inc.*, 05-1511 (La.App. 4 Cir. 12/20/06); 947 So.2d 171, an award of $562,000.00 each for two adult children was affirmed with the comment that the award was "a little higher than some previous awards". And in *Oddo v. Asbestos Corp.*, 04-0004 (La App. 4 Cir., 8/20/15), 173 So.3d 1192, a $600,000.00 jury award for each of two adult children was not challenged on appeal. Though $750,000.00 wrongful death damages to each child was affirmed by our court in Raymond, supra, that case involved four minor children and not adult children as here.

16-839

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT


JIMMY WILLIAMS, SR., ET AL.

VERSUS

PLACID OIL COMPANY, ET AL.


**Savoie, J., concurs in part, dissents in part, and assigns reasons.**

In connection with the survival action, I concur with the majority's opinion affirming the trial court's allocation of 50% of the fault to Ingersoll-Rand and 50% of the fault to Placid Oil. I also concur with the majority's opinion as to quantum. However, I respectfully dissent from the majority's opinion inasmuch as it affirms the trial court's allocation of 100% fault to Ingersoll-Rand in connection with the wrongful death claim.

With respect to the wrongful death claim, I agree that the law applicable to the wrongful death claim is the law in effect at the time of Mrs. Williams' death[17], and therefore La. Civ.Code art. 2317.1[18] and principles of comparative fault are applicable in determining Ingersoll-Rand's liability. However, I would find the trial court manifestly erroneous in failing to allocate any percentage of fault to Placid Oil. The deposition testimony of Prenitiss McLeod, a Placid Oil plant supervisor conclusively establishes that Placid Oil had knowledge at the time Mr.

---

[17] *See, Walls v. American Optical,* 98-455 (La. 9/8/99), 740 So.2d 1262; *See also, Cole v. Celotex,* 599 So.2d 1058 (La.1992).

[18] La.Civ.Code art. 2317.1 states in part:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

35

Williams worked in the compressor room in the 1970's that the Ingersoll-Rand compressors contained asbestos. The record is further replete with evidence establishing that Placid Oil knew, or should have known, of the potential of secondary asbestos exposure from its /employees' work clothes[19], yet it failed to provide adequate warnings or protections. Therefore, Placid Oil should have been allocated a percentage of fault.

When there is a finding that the trial court erred in apportioning fault, the fault allocation should be adjusted "only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." *Clement v. Fry*, 95-1119, pp. 7-8 (La. 1/16/96), 666 So.2d 607, 611. Because of the testimony suggesting that Ingersoll-Rand provided no warnings whatsoever with respect to its compressors that were installed at Placid Oil, it is my opinion that 25% of the fault is the lowest reasonable percentage of fault that the trial court could have allocated to Placid Oil, and therefore, I would reduce Ingersoll-Rand's liability for the wrongful death claim to 75%.

---

[19] See for example, the testimony of Plaintiff's expert in industrial hygiene, Frank Parker, III, who indicated that OSHA regulations pertaining to asbestos became effective in 1970 or 1971, and that the regulations required "steps to be taken by an employer to protect its employees from potential exposure to asbestos[,]" including periodic employee monitoring, protocols to prevent or limit exposure to asbestos, and requiring that "work clothes" and "street clothes" be kept separate, etc. Mr. Parker also testified that as of approximately 1952, asbestosis was a compensable disease under workers' compensation laws. Similarly, Plaintiffs' pathology expert, Dr. Roggli, testified as to the enactment of OSHA regulations in 1970 or 1971 that alerted everyone to the dangers of asbestos. Additionally, Mr. McLeod testified as to his knowledge of OSHA regulations concerning asbestos in the 1970's.