SUE PERRY, ET UX

VERSUS

EMPLOYERS INSURANCE OF WAUSAU, ET AL

NO. 24-CA-535

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ST. JAMES, STATE OF LOUISIANA
NO. 39,108, DIVISION "C"
HONORABLE JAMES E. KUHN, JUDGE PRO TEMPORE, PRESIDING

August 06, 2025

**FREDERICKA HOMBERG WICKER
JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Stephen J. Windhorst, and Scott U. Schlegel

**AFFIRMED**
    **FHW**
    **SJW**

**SCHLEGEL, J., CONCURS IN PART AND DISSENTS IN PART WITH
REASONS**
    **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
DONALD PERRY, PATRICIA PERRY CARR, AND DONNETTE PERRY
REEVES
>    Jeffrey T. Gaughan
>    Thomas J. Kliebert, Jr.
>    Lewis O. Unglesby
>    Madison C. Rowland

COUNSEL FOR DEFENDANT/APPELLANT,
UNION CARBIDE CORPORATION
>    Amanda Fraser
>    Leigh Ann Tschirn Schell
>    Kevin M. Jordan
>    Walter G. Lynch
>    McGready L. Richeson
>    Ernest G. Foundas
>    Milele N. St. Julien
>    Francis X. deBlanc, III
>    Perrey S. Lee
>    Timothy J. Morel
>    Jordan D. Shea

**WICKER, J.**

Defendant-appellant, Union Carbide Corporation ("UCC") appeals the Final Judgment, as amended (the "Judgment"), rendered by the district court after a bench trial, finding it to be at fault in causing the asbestos-related lung cancer of Sue Perry, which the district court found ultimately led to her death, and awarding damages against it and in favor of plaintiffs-appellees, Sue Perry (deceased), her husband, Donald Perry, and her daughters, Donnette Perry Reeves and Patricia Perry Carr. For the reasons stated below, we affirm the district court's judgment.

## STIPULATION BY UCC

For purposes of this appeal, UCC has conceded that "Ms. Perry was exposed to asbestos during an 8–10-week period when she laundered her husband's clothes in the late 1970s and that the exposure was a substantial contributing cause of non-small cell lung cancer diagnosed in 2018."[1] The 8–10-week period in question occurred in 1978, in UCC's Taft, Louisiana, facility ("UCC Taft"), where UCC was conducting a "turnaround"[2] of its Ethylene Amines Unit 1 (the "EA1") located at that facility. During the 8–10-week period, Mr. Perry was contracted to UCC by his then-employer, Brown & Root Industrial Services ("Brown & Root"), and worked as a millwright[3] in the EA1, where his duties included removing insulation from cranes, pumps, turbines and other equipment.

By its express failure to challenge the district court's factual findings relative to Ms. Perry's bystander, or take-home, exposure to asbestos emanating from UCC Taft during the relevant time, and that Ms. Perry's exposure to UCC's asbestos was

---

[1] Appellant's Original Brief, p. 8.
[2] A "turnaround" refers to the shutdown of a unit for scheduled maintenance, servicing, repairs and upgrades.
[3] In the context of this case, Mr. Perry's duties, as a millwright, were to disassemble pumps and turbines and service them for new bearings, seals, and glands, then to reinstall the equipment, including aligning the equipment to the prime mover and to the piping it was associated with. There were a number of pumps and turbines in the EA1.

a substantial cause of Ms. Perry's development of lung cancer in 2018, UCC has effectively conceded that:

(1) Mr. Perry worked at UCC Taft for 8-10 weeks in 1978, during which time he was exposed to asbestos dust and fibers.
(2) Mr. Perry carried asbestos dust and fibers on his clothing from UCC to his home during this 8–10-week period.
(3) Ms. Perry handled and laundered Mr. Perry's asbestos-laden clothing during this 8–10-week period, as a result of which, she herself was exposed to asbestos dust and fibers carried home from UCC by Mr. Perry.
(4) Ms. Perry's exposure to asbestos dust and fibers brought home by Mr. Perry from UCC was a substantial cause of her lung cancer in 2018.

Accordingly, UCC has waived any claims in this appeal that (a) Mr. Perry was not exposed to asbestos at UCC Taft for 8-10 weeks during 1978; (b) even if he was so exposed, the exposure was not of sufficient duration or concentration to cause asbestos-related lung disease; (c) even if he was so exposed for a sufficient duration and in a sufficient concentration to cause asbestos related lung disease, Ms. Perry was not exposed to any asbestos emanating from UCC Taft because she was not living with Mr. Perry during the 8-10 week period in question; and (d) even if Ms. Perry was exposed to asbestos carried home by Mr. Perry from UCC Taft, she was not exposed in sufficient concentrations to cause lung cancer, with or without the presence of asbestosis.[4] We consider the testimony and evidence presented at trial in light of these concessions/waivers.

## STATEMENT OF THE CASE

Sue Perry died on March 4, 2020 from lung-related illnesses. Plaintiffs-appellees contend that she died from lung cancer caused by her take-home exposure to asbestos as a result of laundering Mr. Perry's work clothing, which was filled with asbestos dust to which he was exposed through his employment, including some eight to ten

---

[4] At trial, UCC and its medical expert, Dr. James Crapo, contended, in the face of significant evidence to the contrary, that asbestos-related lung cancer could not develop unless the individual also had asbestosis, a scarring of the lungs caused by exposure to high concentrations of asbestos fibers or asbestos dust. The prevailing medical literature now holds that asbestos-related lung cancers can develop in the absence of asbestosis where there has been significantly concentrated exposures to asbestos.

weeks in 1978 when he worked as a millwright at UCC's Taft, Louisiana facility. As stated above, UCC has conceded that Ms. Perry's lung cancer that was diagnosed in March, 2018, was caused by exposure to asbestos generated at UCC Taft. UCC contends, however, that Ms. Perry did not die from lung cancer, but from COPD[5] which, it contends, is caused by smoking, not asbestos exposure, and that, therefore, it cannot be held liable for her death.

On December 18, 2018, after Ms. Perry was diagnosed with lung cancer – for a second time[6] – but before she died, Mr. and Ms. Perry filed an Original Petition for damages (the "Petition"), naming as defendants, certain asbestos distributors and manufacturers, certain companies through which Mr. Perry contended that he was exposed to asbestos as a consequence of his employment, insurers of these distributors, manufacturers and employers, and certain individual officers of these companies. Relevant to this appeal, included in the former employer group was UCC and the Boise Cascade Company ("Boise").[7]

Relevant to this appeal, the Petition alleged that Mr. Perry had worked as a millwright and pipe fitter in facilities owned by Boise, located in DeRidder, Louisiana, and at UCC Taft.[8] The Perrys further alleged in the Petition that, while working in these facilities, Mr. Perry was occupationally exposed to large quantities of asbestos-containing products.[9] They also alleged that Ms. Perry was exposed to asbestos as a result of gathering, handling and laundering Mr. Perry's asbestos dust laden clothes and the asbestos rags that Mr. Perry brought home from work. The

---

[5] COPD is chronic obstructive pulmonary disease. The testimony and evidence introduced at trial demonstrated that the most common cause of COPD is cigarette smoking.

[6] Ms. Perry had developed lung cancer in 2012, for which she underwent a lobectomy to remove the center lobe of her right lung, thereby removing the cancerous tumor. Ms. Perry also underwent a regimen of chemotherapy at that time. Plaintiffs-appellees have not sought damages in this action related to Ms. Perry's 2012 lung cancer.

[7] The evidence showed that Mr. Perry was employed by Boise from 1968 through approximately 1972, at its mill located in DeRidder, Louisiana, where his duties consisted of multi-craft maintenance work.

[8] The Petition also alleged that Mr. Perry had worked at the Texaco, Inc. facility in Convent, Louisiana, where he was also exposed to asbestos.

[9] Mr. Perry, in fact, developed asbestosis, which requires very high concentrations of exposure.

Perrys alleged that Ms. Perry's lung cancer was due to asbestos exposure, that her condition was incurable and would continue to worsen in the future with no hope of recovery. UCC denied liability.

On November 16, 2020, following Ms. Perry's death, the plaintiffs filed a First Supplemental and Amending Petition (the "Amended Petition"), adding Ms. Perry's daughters, Donnette Perry Reeves and Patricia Perry Carr as plaintiffs. The First Amended Petition alleges that Ms. Perry endured extreme and excruciating pain prior to her death and that, had she lived, she would have been entitled to recover damages for medical expenses incurred prior to her death as well as for the physical and mental pain and suffering she endured in that period. Ms. Reeves and Ms. Carr asserted individual wrongful death actions, alleging that they were very close to Ms. Perry and endured extreme grief and suffering, mental anguish and damages as a result of being deprived of her companionship, support, guidance and affection. Mr. Perry claimed loss of consortium and mental anguish as a result of Ms. Perry's death. The plaintiffs also claimed Ms. Perry's funeral expenses.[10]

All of the defendants except UCC were dismissed from the suit, with prejudice, prior to trial.[11] A bench trial occurred on March 5, 6 and 8, 2024. The matter was taken under advisement and, on June 20, 2024, the district court entered a Final Judgment ruling that: (1) UCC was at fault in causing Ms. Perry's lung cancer; (2) the plaintiffs were awarded $2,756,869.36, plus interest from the date of judicial demand on the survival action; (3) Mr. Perry was awarded $850,000.00 plus interest from the date of judicial demand for his wrongful death claim; (4) Ms. Reeves and Ms. Carr were awarded $700,000.00 each for their wrongful death claims, plus interest from the date of judicial demand; (5) UCC proved that exposure at Boise

---

[10] A Second Amending and Supplemental Petition was filed on January 1, 2021 for the purpose of changing the name of Boise to OfficeMax, Inc., which had acquired Boise.

[11] Boise and Texaco, Inc. settled with the plaintiffs. The other defendants were dismissed, with prejudice, on joint motions finding them not to be at fault and ruling that they could not be considered in any allocation of fault.

substantially contributed to the cumulative dose which caused Ms. Perry's cancer and a virile share was assigned to Boise, reducing the award for the survival action by one-half; (6) UCC proved that exposure at Boise was a contributing factor and 10% fault was assigned to Boise on the wrongful death claims; and (7) all sums due by UCC would bear interest from the date of judicial demand, with costs to be determined through a rule to tax costs. Notice of the Final Judgment was mailed on June 20, 2024.

On June 29, 2024, the plaintiffs filed a Rule to Tax Costs.[12]  On July 3, 2024, UCC filed a request for written reasons for judgment. On August 1, 2024, UCC filed Motion for Suspensive Appeal. The Motion for Suspensive Appeal represents that the appeal bond was posted simultaneously with the filing of the Motion for Suspensive Appeal. On August 8, 2024, the district court entered an order granting UCC's Motion for Suspensive Appeal, thereby divesting itself of jurisdiction of this matter.  A Notice of Appeal was issued on August 14, 2024.  On August 27, 2024, after the grant of UCC's Motion for Suspensive Appeal, but prior to the lodging of the record in this Court, the district court filed into the record its Reasons for Judgment.

On January 7, 2025, defendant-appellant, UCC, timely filed its Original Brief in this Court.  On February 14, 2025, plaintiffs-appellees timely filed their Original Brief in this Court.

On February 19, 2025, this Court issued an Order remanding the matter to the district court and ordering it to amend its Final Judgment to include the appropriate decretal language.  On the same day, the district court signed an Amended Final Judgment, containing appropriate and necessary decretal language.  The Amended

---

[12] The record before us does not contain any ruling on the plaintiffs' rule to tax costs.

Final Judgment was filed in this Court on February 26, 2025, in compliance with this Court's February 19, 2025 Order.

On March 6, 2025 UCC filed in this Court a Notice of Motion for Amendment of Amended Final Judgment, alternatively, Motion for New Trial (the "Motion for Amendment") that it had filed in the district court. Therein, UCC advised this Court that the Amended Final Judgment filed in this Court on February 26, 2025, was erroneous, in that it cast in judgment not only UCC, but also Boise Cascade, a dismissed party. At the time, the case was on this Court's March 11, 2025 docket. On March 10, 2025, after receipt of the Notice of Motion for Amendment, we issued an Order removing the case from our March 11, 2025 docket and remanding the matter to the district court for a hearing on the Motion for Amendment. Thereafter, also on March 10, 2025, the parties filed an Emergency Joint Motion to Reset Oral Argument, wherein they represented that the issues regarding the Amended Final Judgment as to which remand was granted had been resolved by consent of the parties. They further advised that a Second Amended Final Judgment would be filed in this Court by the close of business on that date. Based upon these representations, we placed the case back onto our March 11, 2015 docket. The Second Amended Final Judgment was submitted to this Court on March 10, 2025.[13]

This appeal follows.

## DISTRICT COURT'S REASONS FOR JUDGMENT

Before discussing UCC's assignments of error, we first address an issue raised by the district court's Reasons for Judgment. We begin by pointing out that oral or written reasons for judgment form no part of the judgment, and appellate courts review judgments, not reasons for judgment. *Holmes v. Paul,* 19-130 (La. App. 5 Cir.

---

[13] The Second Amended Final Judgment differs from the Final Judgment and the Amended Final Judgment in that the decrees set forth therein were rearranged and in that it contains an additional paragraph setting forth the net amounts awarded to the Perrys, after applying the district court's findings regarding the fault of Boise Cascade. The Final Judgment, Amended Final Judgment and Second Amended Final Judgment will be collectively referred to herein as the "Judgment".

10/2/19), 279 So.3d 1068, 1075, citing *Wooley v. Lucksinger,* 09-571, 09-584, 09-585, 09-586 (La. 4/1/11), 61 So.3d 507, 572; see also *Bellard v. American Cent. Ins. Co.,* 07-1335 (La. 4/18/08), 980 So.2d 654, 671; *Greater New Orleans Expressway Commission v. Olivier,* 02-2795 (La. 11/18/03), 860 So.2d 22, 24; La. C.C.P. arts. 1918, 2082-2083. Judgments are often upheld or reversed on appeal for reasons and on bases different than those assigned by the trial judge. "The written reasons for judgment are merely an explication of the trial court's determinations. They do not alter, amend, or affect the final judgment being appealed." *State in the Interest of Mason,* 356 So.2d 530, 532 (La. App. 1 Cir. 1977). Thus, we are not bound by reasons for judgment and do not review them other than to gain insight into the district court's judgment. *Lucksinger,* 61 So.3d at 572.

The first paragraph of La. C.C.P. art. 1917, mandates that in nonjury cases, the court "shall give in writing its findings of fact and reasons for judgment" when requested to do so by a party, provided that the request is made within ten days of the notice of the signing of the judgment. If a party does not request reasons for judgment, the district court is not bound to issue them. If requested, the district court must provide them.

Here, Notice of Judgment was sent on June 20, 2024. UCC's Request for Written Reasons for Judgment was fax-filed on June 28, 2024, within ten days of the Notice of Judgment. Accordingly, the district court was required to make findings of fact and issue reasons for judgment. In this case, the district court issued written Reasons for Judgment, but not until *after* UCC's Motion for Suspensive Appeal was granted and the district court had been divested of jurisdiction.

When a trial judge fails to comply with a request for written findings and reasons, the party making the request may either apply for supervisory writs or move the appellate court to remand to compel compliance. *Gisleson v. Deputy,* 13-0150 (La. App. 4 Cir. 8/7/13), 122 So.3d 1089, 1092; *Custom-Bilt Cabinet & Supply, Inc.*

*v. Quality Built Cabinets, Inc.,* 32,441 (La. App. 2 Cir. 12/8/99), 748 So.2d 594, 604. In this case, UCC did not apply for supervisory writs prior to filing its Motion for Suspensive Appeal and by the time the district court issued its Reasons for Judgment, it lacked jurisdiction. Once its appeal had been granted, UCC did not move this Court to remand the matter to permit the filing of the Reasons for Judgment into the record.[14] Under such circumstances we normally would not review or consider the district court's Reasons for Judgment. In this case, however, it has been called to our attention by UCC that, in exercising its role as a fact-finder, and as reflected in its Reasons for Judgment, the district court went outside the record and conducted its own research relative to whether asbestos exposure causes COPD, an issue not developed at trial.

The district court found, as stated in the Judgment, that UCC was at fault in causing Ms. Perry's asbestos-related lung cancer. As stated above, however, UCC contended, as it does here, that Ms. Perry did not die from lung cancer contracted as a result of exposure to asbestos emanating from UCC Taft, as its expert medical witness, Dr. James Crapo, opined at trial. Instead, according to UCC and Dr. Crapo, Ms. Perry died from COPD, which could not have been caused by exposure to asbestos emanating from UCC Taft because asbestos does not cause COPD; rather, COPD is caused by smoking.[15] In discussing Dr. Crapo's testimony in this regard, the district court stated in its Reasons for Judgment that:

> It is appropriate to take judicial notice, as provided for in Code of Evidence Articles 201 and 202, of documents prepared by a group having the moniker, 'NIOSH.'[16] The NIOSH is a government agency

---

[14] As the Reasons for Judgment were issued after the district court had been divested of jurisdiction, in our March 10, 2025 Order remanding the matter to the district court for a hearing and ruling on the Motion for Amendment, we also ordered that the appellate record be supplemented with the Reasons for Judgment while on remand. The consent Second Amended Final Judgment was signed on the same date and the record was supplemented with the Second Amended Final Judgment, but the trial court did not reissue its Reasons for Judgment while the matter was on remand.

[15] Dr. Crapo also opined that Ms. Perry's lung cancer was not caused by exposure to asbestos because she did not have asbestosis, which was required in order for lung cancer to be asbestos-related.

[16] NIOSH is the National Institute for Occupational Safety and Health, a federal institute responsible for making recommendations for the prevention of work-related injury and illness.

created as a portion of OSHA.[17] NIOSH concludes that COPD can be caused by several different factors. A copy is attached to these reasons. It is a paper written by NIOSH Science Blog. It's identified as Judicial Notice Number One, it states: 'Workplace agents associated with COPD include, (and number one is) mineral dust such as coal mine dust, silica and asbestos.' It goes on to state: 'Exposure to specific chemicals appears to increase risk within some industries and occupations.' No acceptable medical or scientific evidence has been offered that COPD can only be caused by smoking. Other government publications state a cause of COPD could be occupational exposure, specifically asbestos. Please see Judicial Notice #2.[18]

A finder of fact may not consider evidence outside the record in making its findings. *Caruso v. Chalmette Refining, LLC,* 16-1117 (La. App. 4 Cir. 6/28/17), 222 So.3d 859, 866; *Weatherly v. Optimum Asset Management, Inc.,* 04-2734 (La. App. 1 Cir. 12/22/05), 928 So.2d 118, 121; *Nail v. Clavier,* 99-588 (La. App. 3 Cir. 11/10/99), 745 So.2d 1221, 1224, *writ denied*, 99-3494 (La. 1/5/00), 752 So.2d 169. La. C.E. art. 201 provides that a court may take judicial notice of an adjudicative fact, which is a fact normally determined by the trier of fact. In order to take judicial notice of a fact, the fact must be one that is (1) generally known within the territorial jurisdiction of the court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Where appropriate, judicial notice may be taken whether requested or not. *See* La. C.E. art. 201(C).

Further, La. C.E. art. 202 provides that a court must take judicial notice of legal matters including: state and federal laws; ordinances enacted by any political subdivision within the court's territorial jurisdiction; proclamations of the President of the United States and the governor of Louisiana; rules of state boards, commissions and agencies of the state that have been published in the Louisiana Register; ordinances enacted by any political subdivision of Louisiana; published court rules

_____

[17] OSHA is the Occupational Safety and Health Administration., a federal government agency responsible for developing and enforcing workplace safety regulations.
[18] Crapo Judicial Notice #1 is entitled *Jobs and Exposures That Increase Risk for Developing COPD Later in Life,* November 18, 2020, by Sharon R. Silver, MS, MA; Walter A. Alarcon MD, MSc and Jia Li, MS., NIOSH Science Blog. Crapo Judicial Notice #2 is entitled *Can asbestos exposure result in COPD,* Helen Miller, medically reviewed by Adithya Cattamanchi, M.D., Pulmonology, updated September 5, 2023, HealthLine Media – U.K.

of federal and state courts; published rules and decisions of boards, commissions and agencies of the United States; and laws of foreign countries, international and maritime law.

In *Acadia-Vermilion Rice Irrigating Company v. Broussard,* 185 So.2d 908, 912 (La. App. 3 Cir. 1966), the court stated:

> Judicial notice is … a method by which the courts dispense with formal proof when there is no real necessity for it because the facts noticed are indisputable as a matter of notorious common knowledge or as being easily capable of immediate verification. … That a matter is judicially noticed means merely that it is taken as true without the offer of evidence by the party who should ordinarily have done so. This is because the Court assumes that the matter is so notorious that it will not be disputed. But the Opponent is not prevented from disputing the matter by evidence, if he believes it disputable.

185 So. 2d at 912 (Citations and internal quotation marks omitted).

The proper function and theory of judicial notice does not permit the court to resolve a disputed issue of material fact by taking judicial notice of its correct determination, without permitting evidence. *Id.* Statements as to which there has been no clear agreement, are not appropriate subjects of judicial notice because they are not in the same vein as the laws of nature, geographic and historical facts, time, the calendar, laws and other matters of common knowledge. Judicial notice is a substitute for, and equivalent of, evidence, and facts should not be "noticed" unless otherwise admissible. *Dimm v. Granier*, 284 So.2d 850 (La. App. 4 Cir. 1973). Because it appears that there has been no wide-spread agreement that COPD can be caused by exposure to asbestos, this is not the type of fact that can be the subject of judicial notice under either Article 201 or 202. The district court erred when it went outside the record, conducted its own research relative to causation of COPD, and took judicial notice, based on its research, that asbestos exposure causes COPD.

Normally, a district court's findings of fact will not be disturbed on appeal absent a determination that they are clearly, or manifestly, wrong. *Stobart v. State, through DOTD,* 617 So.2d 880 (La. 1993); *Rosell v. ESCO,* 549 So.2d 840 (La.

1989). Where, however, legal errors materially affected the outcome of the case and deprived a party of substantial rights the manifest error standard is no longer applicable and if the record is otherwise complete, the appellate court should make its own *de novo* review of the record and determine a preponderance of the evidence." *Evans v. Lungrin,* 97-541 (La. 2/6/98), 708 So.2d 731, 735. Therefore, in this case it is incumbent upon this court to review the question of causation *de novo.* As will be discussed below, as the trial judge's inappropriate independent scientific research was limited to the causation question, we will review the damages awarded for abuse of discretion or manifest error.

As discussed below, based upon our *de novo* review of the entire record of the case, and considering the stipulation by UCC that exposure to asbestos emanating from UCC Taft caused Mr. Perry's lung cancer, we find that the district court's conclusion, based on evidence outside the record, that asbestos exposure is a cause of COPD, did not materially affect the outcome of the case.[19]

## DISCUSSION OF ASSIGNMENTS OF ERROR

On appeal, UCC assigns three errors. First, UCC contends that the district court erred in awarding the plaintiffs damages for Ms. Perry's wrongful death because, according to UCC, Ms. Perry's treating physician opined that her death was caused by COPD and the record contains no evidence that Ms. Perry's COPD was caused by asbestos exposure. Second, and in the alternative, UCC contends that should this Court "allow[] the awards for wrongful death to stand," the district court erred in awarding Ms. Perry's adult daughters $700,000 each for wrongful death damages where Ms. Perry was 83 at the time she died and her ailments limiting her relationship with her daughters were primarily related to COPD, not lung cancer.

---

[19] We also point out that the district court took judicial notice that "[a] death certificate is not final. Taking judicial notice as provided for by Code of Evidence 201 and 202, records and registry from the State of Louisiana provide information that death certificates can be modified." This taking of judicial notice, while inartfully worded was not legal error for the reasons discussed *infra.*

And, third, UCC asserts that the district court erred in awarding $2,525,000.00 for her survival action in light of the facts, according to UCC, that her hospitalizations, most of her treatment, and most of her disability was caused by COPD, and not by asbestos exposure. Finally, on this same basis, UCC contends that the district court erred in awarding funeral and medical expenses for hospice care.

At the core of each of these assignments of error is UCC's contention that Ms. Perry died solely from COPD and that since there was no evidence in the record that COPD is caused by asbestos exposure, the district court erred in awarding survivor and wrongful death damages. If, however, asbestos-related lung cancer is found to be a substantial contributing cause of Ms. Perry's suffering and ultimate death, then UCC's claims fail. In that event, UCC requests that we review the quantum of the survivor and wrongful death awards.

Much of the evidence presented at trial was directed towards the issues (i) whether Mr. Perry was actually present at UCC Taft during the EA1 unit turnaround; (ii) whether asbestos-containing insulation was present in the EA1 unit during the time Mr. Perry worked there in 1981; (iii) whether the concentrations of asbestos, if any, were present in sufficient quantity to cause asbestos-related illnesses; (iv) whether UCC knew the dangers of asbestos, including, "take-home" or "bystander" exposure, at the time when Mr. Perry was working in the EA1 unit; (v) whether UCC knew, at the time when Mr. Perry was working in the EA1 unit that smoking combined with asbestos exposure exponentially increased the risk of developing lung cancer; (vi) whether Mr. Perry and other workers were warned of the dangers of asbestos, including asbestos and smoking; (vii) whether anyone – either UCC or Brown & Root – provided any safety measures to prevent or mitigate the effects of asbestos exposure; (ix) which company – UCC or Brown & Root – was responsible for advising Mr. Perry and his co-workers of the dangers of asbestos and providing them with a safe working environment; (x) whether Ms. Perry was present at UCC Taft

and living with Mr. Perry while Mr. Perry was working in the EA1 unit; (xi) whether Ms. Perry was, or could have been exposed to asbestos through Mr. Perry in sufficient concentrations to cause lung cancer; (xii) and whether asbestos exposure, without asbestosis, can cause lung cancer. Because UCC has effectively stipulated that Ms. Perry's 2018 lung cancer was caused by her take-home exposure to asbestos emanating from UCC Taft, we need not review the evidence on these points and we proceed to a review of the medical evidence upon which UCC relies in support of its assertion that Ms. Perry died of COPD, not asbestos-related lung cancer, namely, Ms. Perry's testimony relative to her medical condition and smoking history, her medical records, her Heart of Hospice intake forms and Death Note, her death certificate, Dr. Crapo's testimony to the effect that asbestos exposure does not cause COPD, the testimony of Ms. Perry's treating pulmonologist, Dr. Clifford Courville, and the testimony of the Perrys' medical expert, Dr. Stephen Haber.

**1. Testimony of Ms. Perry**

Ms. Perry was deposed on April 2, 2019. Ms. Perry described her illness as lung cancer, which she had twice, the first time in 2012.[20] She testified that, in 2017, she had repeated episodes of bronchitis. An x-ray showed that there was something in her lung. Dr. Courville was called in and, in 2018, he discovered that Ms. Perry had lung cancer (adenocarcinoma) that was attached to a rib deep in the upper lobe of her lung. Dr. Courville informed Ms. Perry that her cancer was likely caused by exposure to asbestos. Ms. Perry testified that her doctors told her that her cancer was inoperable. Dr. Courville called in another specialist, Dr. James Maze, who administered five radiation treatments to Ms. Perry. After the five radiation treatments, Ms. Perry was told that there was nothing more that the doctors could do for her. Ms. Perry testified

---

[20] Ms. Perry testified that in 2012 she had a spot inside her lung that was lung cancer. According to Dr. Courville, this cancer was also attributable to asbestos exposure. She had surgery to remove the center lobe of her right lung. After surgery, she underwent chemotherapy for about six months. These procedures were successful in treating her first lung cancer.

that, after her last stay in the hospital her prognosis was of survival for only a couple of months. Ms. Perry did not provide any testimony relating to COPD.

Ms. Perry testified that she had been a smoker but had not had a cigarette since 1990. When she smoked, she smoked about a half-pack of cigarettes per day and went up to about a pack a day as time passed. She started smoking when she was 18 and smoked unfiltered Camel cigarettes. When she first started smoking, she smoked about a pack a week. She continued to smoke on a regular basis until she quit in 1990. She would quit occasionally for short periods of time but did not actually quit until 1990. When she was smoking, her doctors encouraged her to quit. She was finally able to quit in 1990 when the patch came out. She tried the patch and it worked for her.

## 2. Ms. Perry's Medical Records

Ms. Perry's medical records, introduced at trial showed the following:

In 2012, Ms. Perry was diagnosed with neuroendocrine cancer in the center of her right lung. At that time, pleural plaques were discovered in her lungs.[21] She was also diagnosed with COPD at that time. She successfully underwent a lobectomy/lung resection on November 15, 2012 and had 36 chemotherapy treatments following her surgery.

In December, 2016, following the successful treatment of her first lung cancer, Ms. Perry again began to suffer respiratory issues and was referred to Dr. Courville, complaining of shortness of breath. At the time she presented to Dr. Courville, his records noted Ms. Perry's prior lung cancer and treatment; stated that Dr. Courville had found ground glass infiltrate in her lungs; and also indicated that Ms. Perry met the criteria for COPD – unspecified -- with frequent exacerbations but only moderate obstruction. Dr. Courville's records also indicate that Ms. Perry had 47 pack years of

---

[21] As discussed, *infra,* the presence of pleural plaques is indicative of overexposure to asbestos.

smoking history but had not smoked in 30 years. The evidence introduced at trial demonstrated, however, that Ms. Perry's smoking history was 32 pack years and that she had quit smoking in 1990.

In March, 2018, Dr. Courville diagnosed Ms. Perry with malignant neoplasm of middle lobe bronchus or lung, acute bronchitis, unspecified, and COPD, unspecified. In April, 2018, Ms. Perry presented to Dr. Courville complaining of shortness of breath. She was assessed as having malignant neoplasm of middle lobe, bronchus or lung, COPD with acute exacerbation, and acute and chronic respiratory failure with hypoxia. A CT scan of Ms. Perry's lungs showed "nodular ground glass opacity within the right lower lobe," "other patchy areas of ground glass within the lungs," nonspecific fibrotic changes within the lung apices," "partially calcified left pleural plaques" and "stable smaller pulmonary nodules and mediastinal lymphadenopathy…may correspond with the patient's known lung cancer." Due to Ms. Perry's pulmonary status, the cancer was inoperable and Ms. Perry was referred for radiation (SBRT) therapy. Her discharge summary lists her pulmonary diagnoses as acute exacerbation of COPD and tracheobronchitis, acute respiratory failure and lung cancer.[22]

In sum, Ms. Perry's medical records throughout March and April 2018 indicate that, from a respiratory standpoint, she was suffering from a chronic cough, dyspnea (shortness of breath), COPD, unspecified, lung cancer, and obstructive sleep apnea, all of which were contributory to her diagnosis of acute to chronic respiratory failure. By late-August, 2018, Ms. Perry's prognosis was listed as "poor" and it was noted that she had "clearly declined in recent months from a functionality standpoint." Her discharge summary on November 3, 2018, following a hospital stay of several days, listed her diagnoses as pseudomonas and E.coli bilateral pneumonia noted as

---

[22] Ms. Perry was diagnosed with other non-pulmonary conditions which are not relevant to the current appeal.

"improving;" acute respiratory failure with hypoxemia and carbon dioxide retention, again, noted as "improved;" COPD exacerbation, noted as "resolving;" and lung cancer, noted as "with recent completion of radiation treatment."

Ms. Perry's medical records, dated October 30, 2018, stated that she had a past medical history of advanced lung disease secondary to lung adenocarcinoma, right middle lobectomy, chronic respiratory failure…with a recent history of tracheobronchitis [and] Community Acquired Pneumonia … ." Those records also note that a bronchoscopy showed "no evidence of tumor recurrence." A chest x-ray performed on Ms. Perry on November 2, 2018 showed "calcified left-sided pleural plaques and mild interstitial infiltrates in her lungs." When Ms. Perry was discharged from the hospital on November 3, 2018, she requested hospice care and was referred to Heart of Hospice.

## 3. Hospice Records

The hospice records show that Ms. Perry had a hospice visit on November 3, 2018. The record of that visit indicated under "Eligibility Criteria," the conditions supporting her hospice admission were COPD, dyspnea, O2 dependent, chronic respiratory failure with hypercapnia. Lung cancer is listed as a comorbidity. The hospice admitting record of that date states that Ms. Perry's medical history is a "history of advanced lung disease secondary to lung adenocarcinoma … ." On November 9, 2018, Dr. Keith Lechtenberg, the medical director of Heart of Hospice wrote:

> Sue Perry is an 82-year-old white female with admitting hospice diagnosis of COPD. Her secondary diagnoses include dyspnea, oxygen dependency, chronic respiratory failure with hypercapnia, weakness and fatigue. She has comorbidities of dementia, hyperkalemia, hyperphosphatemia, recurrent pneumonia, sepsis mat with intermittent RVR, lung cancer, which is apparently in remission, hyperlipidemias, GERD, depression, anxiety, tremors and coronary artery disease status post MI. She has Code Status DNR.

***

History of disease progression – an 82-year-old female, past medical history of advanced lung disease secondary to lung adenocarcinoma status post right middle lobectomy, but chronic respiratory failure and COPD…With the above medical diagnosis if they progress at expected course, I do give her life expectancy of six months or less. She is hospice eligible.

Ms. Perry's hospice Death Note prepared by her hospice nurse following her death indicates that Ms. Perry died shortly after 4:00 a.m. on March 4, 2020 after reporting difficulty breathing to Mr. Perry. The hospice nurse was not present when Ms. Perry died. The Death Note, as did the other hospice records, indicated that Ms. Perry's admitting hospice diagnosis was COPD.

## 4. Death Certificate

Ms. Perry's death certificate, prepared by the Beauregard Parish Coroner, lists her immediate cause of death as COPD. No autopsy was performed to confirm the cause of death.

## 5. Testimony of Dr. Crapo

UCC's medical expert, Dr. Crapo, was accepted by the district court as an expert in pulmonary medicine, internal medicine and inhalation toxicology. The majority of Dr. Crapo's testimony focused on the cause of Ms. Perry's lung cancer, which he opined was cigarette smoking over a long period of time. Dr. Crapo presented a great deal of testimony regarding the correlation between smoking and lung cancer.

As to asbestos and lung cancer, in a nutshell, Dr. Crapo opined that Ms. Perry's lung cancer was not caused by asbestos exposure. According to Dr. Crapo, unless Ms. Perry had asbestosis, she could not have developed asbestos-related lung cancer. In other words, it was Dr. Crapo's opinion that asbestosis is a prerequisite for the development of asbestos-related lung cancer. Dr. Crapo provided a great deal of testimony regarding dose levels and concluded that Ms. Perry could not possibly have been exposed to a level that would have caused her lung cancer, although he did not address the presence of pleural plaques in Ms. Perry's lungs.

Dr. Crapo opined, based on his review of Ms. Perry's medical records and x-rays of her lungs, that Ms. Perry did not die from lung cancer, but from severe exacerbation of COPD. He testified that COPD is an inflammatory process of the lung, which is the most common lung disease in the United States, and is "probably the fourth, fifth, or sixth leading cause of death." Dr. Crapo stated that COPD starts in the lower airways and, over time, destroys the small airways and causes holes to develop in the lungs, making it very hard to breathe because it destroys the lung's ability to exchange oxygen into the blood. According to Dr. Crapo, Ms. Perry had oxygen tension and respiratory failure that were caused by COPD.

Dr. Crapo explained that exacerbations can be of varying degrees. A mild exacerbation causes the person to become short of breath, to have a cough and more sputum production. A mild exacerbation can be treated with an antibiotic. A severe exacerbation occurs where the patient's condition requires hospital admission. According to Dr. Crapo, the average person with COPD will have two or three serious exacerbations before they die.

According to Dr. Crapo, Ms. Perry had three exacerbations that required hospitalization in 2018. In August 2018, she had an exacerbation that caused acute respiratory failure. Ms. Perry had low oxygen and her $CO_2$ was going up, causing her to be short of breath because she could not control her acid base levels. Acute respiratory failure is a classic COPD exacerbation. In October 2018, Ms. Perry exacerbated again at which point she was admitted to hospice with an admitting diagnosis of COPD. Dr. Crapo stated that a bronchoscopy performed on Ms. Perry at that time did not find any evidence of tumor progression although, he admitted that this did not mean that the tumor was completely gone; it just meant that they could not see it. Also, the immediate cause of death listed on her death certificate was COPD. Based on these records, Dr. Crapo opined that Ms. Perry died from COPD,

not lung cancer. He further testified that exposure to asbestos does not cause COPD and that the sole cause of COPD is cigarette smoking.

## 6. Testimony of Dr. Courville

The plaintiffs introduced the testimony of Dr. Courville taken by deposition on September 22, 2022. Dr. Courville testified that he was a pulmonary critical care doctor at Lake Charles Memorial Hospital. Dr. Courville testified that Ms. Perry's illness was COPD and lung cancer. Dr. Courville opined that Ms. Perry's 2018 lung cancer was caused by smoking and exposure to asbestos.[23] His opinion was based on the fact that Ms. Perry had pleural plaques in her lungs, which are associated with exposure to asbestos. Dr. Courville could not identify any possible cause of Ms. Perry's pleural plaques other than asbestos exposure. According to Dr. Courville, "any exposure [to asbestos] increases the risk of pleural plaques."

On the other hand, Dr. Courville testified that the most common cause of COPD is smoking. He stated that the diagnosis of COPD was not really an asbestos related finding. COPD causes progressive shortness of breath. It can cause respiratory failure and susceptibility to recurrent infections but COPD does not create pleural plaques. In the months prior to Ms. Perry's death, Dr. Courville was treating her for recurrent respiratory failure and he believes that to have been the cause of her death. Dr. Courville opined that Ms. Perry's chronic COPD was a factor in Ms. Perry's death. It was Dr. Courville's opinion that Ms. Perry died from chronic respiratory failure.

## 7. Testimony of Dr. Steven Haber

Dr. Haber was accepted by the district court as an expert in pulmonology and internal medicine. Dr. Haber treated patients with pulmonary diseases for more than 30 years but retired from active practice in February 2024.

---

[23] Dr. Courville also testified that Ms. Perry's 2012 lung cancer was asbestos-related. Dr. Courville further testified that Ms. Perry's lung cancers were not a recurrence of her breast cancer from 1990, nor was her 2018 cancer a recurrence of her 2012 cancer.

Dr. Haber was not one of Ms. Perry's treating physicians but he reviewed all of her medical records and interviewed her prior to her death. Dr. Haber also read the depositions of Mr. and Ms. Perry and Dr. Courville and was present in court for the testimony of the witnesses, including Dr. Crapo.

Dr. Haber opined that Ms. Perry died from a combination of COPD and respiratory failure related to her lung cancer. Dr. Haber explained that Ms. Perry's medical records showed that in 2012, Ms. Perry underwent pulmonary testing prior to being diagnosed with lung cancer. Those tests showed a very mild amount of COPD. Ms. Perry was then diagnosed with lung cancer and had a good portion of her lung removed. Subsequent lung function testing showed a reduction in lung function. Then, between her cancer surgery in 2012 and the time she began to develop lung problems in approximately 2018, Ms. Perry had little in the way of symptomology. Most of her exacerbations of her COPD occurred at and after the time she was diagnosed with lung cancer in 2018 and her doctors were trying to treat her cancer. Furthermore, according to Dr. Haber, Ms. Perry's medical records did not indicate that her 2018 lung cancer was ever cured or in remission. Dr. Haber stated "… to think that … the lung cancer played no role in a respiratory-related death is … in my opinion, just flat out wrong."[24]

Dr. Haber testified that Ms. Perry reported to him that she had smoked between a half and one pack of cigarettes per day from the time she started smoking in the 1950s until 1990, which did not amount to 47 pack years of smoking; her smoking history would have been in the low- to-mid- 30s in terms of pack years. At the time of her death, Ms. Perry had not smoked for nearly 30 years. Nevertheless, Dr. Haber considered Ms. Perry's smoking history to be significant.

---

[24] Further, Dr. Courville, Ms. Perry's treating physician did not testify that Ms. Perry's lung cancer was not a significant contributing factor to the chronic respiratory failure that ultimately caused her death.

Dr. Haber testified that once a person quits smoking, their risk for smoking-related lung disease decreases and continues to decrease for as long as they continue not to smoke. Dr. Haber explained that the carcinogens present in cigarettes will dissipate from the human body over time, but once asbestos fibers enter the human body, they do not go away. Asbestos fibers continue to irritate and inflame the body for decades. Dr. Haber stated that cigarette smoke is the most common cause of COPD and that Ms. Perry's smoking history contributed to her COPD.

Dr. Haber testified that Ms. Perry had pleural plaques in her lungs, both calcified and non-calcified. Her CT scan showed these plaques to be in the classic position and appearance for asbestos-related pleural plaques. The presence of pleural plaques is objective evidence of asbestos exposure. As had Dr. Courville, Dr. Haber found no rational reason for Ms. Perry having pleural plaques other than asbestos exposure.

Dr. Haber stated that Ms. Perry's death certificate listing her immediate cause of death as COPD, was unsupported by her medical records and that while COPD contributed to Ms. Perry's death, it was not the sole cause of her death. Dr. Haber opined "… to say that … untreated lung cancer is not part of a terminal diagnosis is absolutely asinine … That makes no scientific sense."

Dr. Haber stated that Ms. Perry's lung cancer was "untreated" because the SBRT that she underwent was not curative, it was palliative, trying to slow things down; the only curative intent for non-small cell lung cancer is lung resection. It was Dr. Haber's opinion that Ms. Perry's lung function was affected by both her COPD and her lung cancer and that each contributed to her death. Dr. Haber opined that Ms. Perry "had significant diseases of the lung. Lung cancer and the COPD. She'd also had prior lung cancer, which caused a resection of the lung. So, she actually had a smaller part of the lung gone … less lung."

**UCC's Assignment of Error No. 1 (Causation)**

As stated above, because the district court impermissibly considered evidence outside the record in making its factual determination that, even if Ms. Perry's death was caused by COPD, rather than her asbestos-related lung cancer, her exposure to asbestos could also have caused her COPD, we will conduct a *de novo* review of the evidence relative to causation. In order to recover damages in this case, the plaintiffs were required to prove by a preponderance of the evidence that UCC's conduct was a substantial factor bringing about the complained of harm. *Dabog v. Deris,* 625 So.2d 492, 493 (La. 1993). UCC contends that Ms. Perry's sole cause of death was COPD and that the COPD is primarily caused by smoking, not by exposure to asbestos. We find that while the testimony and evidence support UCC's contention that COPD is primarily caused by smoking, they do not support UCC's contention that COPD was the sole cause of Ms. Perry's death. Dr. Courville, Ms. Perry's treating pulmonologist, opined that COPD was a contributing cause of Ms. Perry's death. He did not opine that it was the *sole* cause of her death. Based on Ms. Perry's medical records, Dr. Haber concluded that *both* COPD and lung cancer substantially contributed to Ms. Perry's death.

Dr. Haber explained that Ms. Perry's lung resection in 2012 due to asbestos-related lung cancer, weakened her lungs and left her with less lung capacity. Still, her COPD was mild until she started having issues that led to her 2018 diagnosis of lung cancer. Once she was diagnosed with lung cancer, her COPD became progressively worse and her exacerbations more severe. Dr. Haber testified that the pleural plaques in Ms. Perry's lungs also contributed to her pulmonary issues.

Only Dr. Crapo opined that Ms. Perry's death was solely caused by COPD. As stated above, it is Dr. Crapo's opinion that lung cancer cannot be caused by exposure to asbestos in the absence of asbestosis. Dr. Crapo based this opinion on studies that had been called into question by more recent studies on asbestos and lung cancer

which conclude that asbestosis is not a prerequisite for the development of asbestos-related lung cancer. As further stated above, Dr. Crapo failed to address the pleural plaques present in Ms. Perry's lungs.

Prior to being retained as an expert witness by UCC in this case, Dr. Crapo had testified in a multitude of asbestos cases, all on the side of the asbestos-defendants and had never in any case concluded that an asbestos-defendant played any role whatsoever in the development of a plaintiff's lung disease. As of the time of trial, Dr. Crapo had been paid more than $15 million by asbestos-industry-defendants.

The foregoing factors significantly weaken Dr. Crapo's credibility. Further, by stipulating that Ms. Perry's 2018 lung cancer was caused by take-home exposure to asbestos emanating from UCC Taft, UCC has implicitly rejected its own expert's conclusions relative to asbestosis and lung cancer.

We stated in *Mendez v. Regional Transit Authority (TMSEL), et al.,* 13-297 (La. App. 5 Cir. 11/19/13), 130 So.3d 352, 355 that:

> Experts' testimony may be given different weights depending on their qualifications and the facts upon which their opinions are based. For example, the general jurisprudential rules are that a treating physician's opinion is given more weight than a non-treating physician, and the testimony of a specialist is entitled to greater weight than a general practitioner. The trial court, however, is not bound to accept the testimony of an expert whose testimony is presumptively given more weight if he finds the opinion is less credible than that of other experts.

In this case, Ms. Perry's treating physician opined that her death was caused by chronic respiratory failure, even though he was not attending her when she died. He testified that COPD was a contributing factor to her chronic respiratory failure but never stated that COPD was the sole cause of her chronic respiratory failure. Dr. Courville did not testify that Ms. Perry's lung cancer played no part in her death. Dr. Haber, who reviewed all of Ms. Perry's medical records, not just those of Dr. Courville, categorically testified that Ms. Perry's lung cancer was a substantial contributing cause of her death, together with her COPD. We find their opinions to

be more credible than those of Dr. Crapo. We do not interpret Ms. Perry's medical and hospice records to exclude lung cancer as a cause of her problems and her ultimate death, as Dr. Crapo contended and as UCC contends here.

All of Ms. Perry's medical and hospice records included lung cancer as a diagnosis and her medical history described her pulmonary conditions, including COPD, as being "secondary to lung adenocarcinoma." Further, although the admitting note in the hospice records indicated that Ms. Perry's lung cancer was "apparently in remission," the medical records from her treating physicians do not state, and UCC did not prove, that Ms. Perry's cancer was cured or in remission as of late-October/early-November 2018. In addition, although the bronchoscopy that was performed on Ms. Perry during that hospital visit did not show the tumor, even Dr. Crapo conceded that the tumor may have still been there, but "they could not see it."

Nor do we find the notation on Ms. Perry's death certificate that the immediate cause of her death was COPD is conclusive as to her cause of death. Dr. Courville testified that he had been treating Ms. Perry for chronic respiratory failure related to COPD and lung cancer prior to her death. No doctor or nurse was present when Ms. Perry died. No autopsy was performed to confirm the cause of death listed on the death certificate.

La. R.S. 13:5713(E)(1) provides that the cause of death, as incorporated in a death certificate is the legal cause of death unless the court in the parish where the death occurred declares otherwise. In interpreting La. R.S. 13:5713(E)(1), four Louisiana circuit court of appeal have held that a death certificate is proof only of the death itself, not proof of the cause of death, and is inadmissible for the purpose of showing the cause of death. *Prine v. St. Paul Fire and Marine Insurance Co.,* 32-559 (La. App. 2 Cir. 12/8/99), 749 So.2d 831, *writ denied,* 00-32 (La. 2/18/00), 754 So.2d 975; *McKelvey v. City of Dequincy,* 07-604 (La. App. 3 Cir. 11/14/07), 970

So.2d 682, 688; *Alexander v. State of Louisiana, Department of Health & Hospitals,* 94-714 (La. App. 3 Cir. 12/7/94), 648 So.2d 11, 14, *citing Bailey v. State of Louisiana,* 623 So.2d 704, 706 (La. App. 4 Cir. 1993); *Ray v. Federated G'ty Life Ins. Co.,* 381 So.2d 847, 848 (La. App. 1 Cir. 1980); *Haydel v. Aetna Life and Cas. Inc. Co.,* 365 So.2d 933, 933-34 (La. App. 4 Cir. 1978) (death certificate and coroner's jury verdict, although admissible to show the fact of death, were not admissible for the purpose of establishing the physiological or pharmacological cause of death); *Franklin v. Old Colony Insurance Co.,* 150 So.2d 892, 895 (La. App. 4 Cir.), *writ refused,* 244 La. 472, 152 So.2d 564 (La. 1963) ("[a] death certificate, including a certificate from a coroner's office or the report of a coroner's jury, is competent proof only of the death itself and no further; it is not proof of the cause of death and is inadmissible for the purpose of showing cause." (citations omitted)).

In *Morris v. Reve, Inc.,* 95-310 (La. App. 5 Cir. 11/17/96), 662 So.2d 525, *writ denied,* 95-3037 (La. 2/16/96), 667 So.2d 1055, this Court, applying a different statute, La. R.S. 40:42(A), stated that a death certificate is admissible under La. C.E. art. 803(9) and, under La. R.S. 40:42(A), is "prima facie evidence of the facts contained therein." In other words, we found that the death certificate creates a rebuttable presumption that the cause of death is that listed in the death certificate. Our statement in *Morris* would appear to create a split among the circuits. The Louisiana Supreme Court has not opined on the issue whether a death certificate is admissible for the purpose of showing the cause of death.

In this case, however, it is immaterial whether Ms. Perry's death certificate is inadmissible for the purpose of showing the cause of death or whether it creates a rebuttable presumption that her cause of death was COPD. There does not seem to be any dispute among the circuits that, in the context of wrongful death litigation, a party is not precluded from introducing evidence expanding upon or contradicting

the cause of death listed in the death certificate; nor is a court proscribed from making its own findings as to the cause of death, based on the evidence presented. *See Brooks v. Foret,* 314 So.2d 542, 545 (La. App. 1ˢᵗ Cir. 1975); *Bailey, supra*; *Alexander, supra; Franklin, supra*; *Prine, supra*; *McKelvey, supra*; and *Morris, supra.*[25]

In this case, Ms. Perry's death certificate does not comply with the requirements of La. R.S. 40:34.10(19)(d) in that it does not show "the course of the disease or the sequence of causes resulting in the death; and contributory or secondary causes, the duration of each, and whether any primary or secondary causes of death are attributed to dangerous or insanitary conditions of employment." The coroner's non-compliance with the statutory requirements for death certificates in this case calls into question whether the death certificate would, in any case, give rise to a rebuttable presumption. We need not opine on this issue, however, because we find that the testimony and evidence presented at trial was sufficient to rebut any presumption afforded to Ms. Perry's death certificate.

---

[25] In *Morris,* the decedent's autopsy report was admitted into evidence at trial. The autopsy report was the sole basis of the opinion of the defendant's expert that the decedent's death from coronary issues was not related to extraordinary and unusual stress conditions at the worksite where he died, as required under La R.S. 23:1021(7)(e). The decedent's death certificate was also admitted at trial, listing decedent's cause of death as "myocardial Infarction Atherosclerotic Coronary Artery Disease." 662 So.2d at 528. The trial judge, apparently, relied on the testimony of the defense expert in denying benefits.

On appeal, the plaintiff argued that the trial court improperly admitted the autopsy report for anything other than establishing the date and time of death. The plaintiff did not challenge the admission of the death certificate, on appeal. Even though its admissibility was not challenged, we stated that it was admissible under La. C.E., Article 803(9) and was prima facie evidence of the facts contained therein under La. R.S. 40:42(A). We held that the autopsy report was admissible under Rule 2143(1) of the Office of Worker's Compensation Administration.

In reversing the trial judge's finding that the plaintiff was not entitled to compensation, we found that, in the face of testimony from the decedent's co-workers regarding the extreme heat conditions in which they were working at the time of decedent's heart attack, the testimony of the defense expert, which was based solely on the autopsy report, was insufficient to defeat the plaintiff's claim for worker's compensation benefits. Thus, while admissible to establish the immediate cause of death, other evidence was introduced by the plaintiff to demonstrate that decedent's heart attack was brought on by extraordinary and unusual conditions at the worksite. That is the case here. Ms. Perry's death certificate indicates COPD as the cause of death, but the other evidence introduced at trial demonstrates that lung cancer was a substantial contributing factor leading to her death.

There is no evidence that the coroner made any independent investigation into Ms. Perry's cause of death. The only person with Ms. Perry at the time of her death was Mr. Perry. The only source of information available to the coroner at the time of Ms. Perry's death as to her cause of death would have necessarily been hearsay statements. Our *de novo* review of Ms. Perry's medical records and the testimony presented at trial convinces us that Ms. Perry's lung cancer, which UCC admits was caused by take-home exposure to asbestos emanating from UCC Taft, was a substantial contributing factor in Ms. Perry's death.

## Quantum

Because the district court's error in looking outside the record to support its findings relative to causation did not extend to its assessment of quantum, our *de novo* review does not extend to the damage awards made in this case; instead, we review the amount of damages awarded by the district court for abuse of discretion/manifest error, as the Louisiana Supreme Court has instructed.

> It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. Louisiana Civil Code article 2324.1 provides: 'In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.' Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review.

*Guillory v. Lee*, 09–75 09-75 (La. 6/26/09), 16 So.3d 1104, 1116–1118, citing *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70, 74.

> [B]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

*Wainwright*, 774 So.2d at 74 (quoting *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted)).

Further, reasonable persons frequently disagree about the measure of damages in a particular case. *Williams v. Placid Oil Co.*, 16-839 (La. App. 3 Cir. 8/2/17), 224 So. 3d 1101, 1111–14, *writ denied*, 17-1501 (La. 11/17/17), 229 So.3d 929.

In this case, the evidence showed that Mr. and Ms. Perry were married for 62 years and that their marriage was a happy one. They did everything together – hunting, fishing, bowling and traveling. Ms. Perry traveled with Mr. Perry when he had to go out of town for work. The Perrys had two daughters, who are adults. When the girls were younger, they traveled with their parents to Mr. Perry's worksites when possible. As adults, neither lived more than nine miles from their parents' home. The Perrys were a very tight-knit family and spent time together throughout their lives.

Ms. Perry was an avid gardener and very active in her church. Ms. Perry was the center of the family. Ms. Reeves described Ms. Perry as "strong and in control." Ms. Perry brought her daughters up to be strong and independent. Ms. Perry was also a very big part of the lives of her two granddaughters and, in time, her six great-grandchildren.

After Ms. Perry's first cancer, she continued to take care of things and to do the things she enjoyed, but she slowed down a little. In approximately 2017, when Ms. Perry again became ill, her life changed drastically. She had increasing problems with her breathing and was in and out of the hospital. She was on oxygen around the clock and became bedridden. She had trouble getting dressed, bathing, and doing even simple things around the house. Ms. Perry became completely unable to do the things that she enjoyed in life. She became very frustrated and depressed as a result of her limitations. Mr. Perry became Ms. Perry's primary caregiver.

Ms. Perry's cancer treatments in 2018 were very hard on her. She became weak and tired all of the time, which took a mental and physical toll on her. It was very hard for her daughters and Mr. Perry to see Ms. Perry in that condition. Ms. Perry lived for nearly two years after she was diagnosed with lung cancer, in a state

of progressive deterioration. Her daughters testified that the last few months before her death were "hell" for Ms. Perry.

Living with the knowledge that her illness was terminal in the short term was hard for Ms. Perry. Ms. Perry testified that her mother lived to be 98 years old, and her sister, who had at the time recently passed away, lived to be 91. Ms. Perry had expected that she would also live into her 90s.

Ms. Perry was a very important part of her daughters' lives. Ms. Reeves and Ms. Carr described their mother as "extraordinary." Each of them had a close relationship with Ms. Perry and saw her often. Ms. Perry's daughters loved her very much and she was a constant source of support and love for them throughout her life. They had to watch her die a painful and debilitating death. Both were still devastated by Ms. Perry's death when they testified at trial, even though it had been some four years since Ms. Perry died.

**UCC's Assignment of Error No. 2**

Based on the evidence presented at trial, the district court awarded Ms. Reeves and Ms. Carr $700,000 each in wrongful death damages, to be reduced to $630,000.00, after accounting for the 10% fault that was assigned to Boise. These awards are challenged by UCC in its second assignment of error. Wrongful death damages are intended to compensate the survivors designated by La. C.C. art. 2315.2, for their own injuries arising from the loss of the decedent. "The elements to consider in making an award of wrongful death damages include loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses." *Raymond v. Government Employees Ins. Co.*, 09-1327 (La. App. 3 Cir. 6/2/10), 40 So.3d 1179, 1191, citing *Smith v. Municipality of Ferriday*, 05-755 (La. App. 3 Cir. 2/1/06), 922 So.2d 1222, *writ denied*, 06-934 (La. 9/29/06), 937 So.2d 860. In reviewing damage awards, the court of appeal considers the circumstances of the particular case in light

of a review of awards made in similar cases. *Pete v. Boland Marine & Manufacturing Co., LLC,* 23-170 (La. 10/20/23), 379 So.3d 636, 644.

In *Williams, supra,* the court upheld wrongful death awards of $750,000.00 to four adult children for the loss of their mother to mesothelioma. The recent case, *Stauder v. Shell Oil Company,* 22-0593 (La. App. 4 Cir. 6/3/24), 409 So.3d 1, *writ denied,* 24-860 (La. 4/23/25), 406 So.3d 1175 ("*Stauder II*"), involved awards of wrongful death damages to the decedent's two adult daughters (against UCC) for the wrongful death of their father as a result of mesothelioma. The jury awarded the daughters a total of $5,500,000.00 in wrongful death damages and the district court entered judgment in conformity with the award. The Fourth Circuit affirmed the awards on appeal (*Stauder v. Shell Oil Co.,* 22-593 (La. App. 4 Cir. 2/15/23), 382 So.3d 138 ("*Stauder I*")) and UCC sought writs to the Louisiana Supreme Court, which vacated the Fourth Circuit's decision (*Stauder v. Shell Oil Col,* 23-619 (La. 1/27/24), 376 So.3d 837) and ordered the Fourth Circuit to reconsider its ruling in light of *Pete, supra,* where the Court held that "an appellate court must consider relevant prior general damage awards as guidance in determining whether a trier of fact's award is an abuse of discretion." *Pete,* 379 So.3d at 639.

On remand, the Fourth Circuit found that recent awards in similar cases revealed awards ranging from $500,000.00 to $750,000.00 for adult children for the loss of a parent. In *Glaser v. Hartford Fire Ins. Co.,* 22-534 (La. App. 1 Cir. 8/3/23), 375 So.3d 479, 495, *writ denied,* 23-1346 (La. 1/10/24), 376 So.3d 130, *writ denied,* 23-1341 (La. 1/10/24), 376 So.3d 134, and *writ denied,* 23-01300 (La. 1/10/24), 376 So.3d 136, a pre-*Pete* case reviewed by the Fourth Circuit, the First Circuit had found that jury awards of $1.5 million in wrongful death damages to each of the 89-year-old decedent's seven adult children were excessive. Based on its review of similar awards, the First Circuit reduced the awards to $500,000.00 each per child.

The Fourth Circuit also reviewed *Lege v. Union Carbide Corp.,* 20-252 (La. App. 4 Cir. 4/1/21, 356 So.3d 617, 638-40, *as clarified on reh'g*, 20-0252 (La. App. 4th Cir. 5/12/21), 366 So.3d 75, *writ denied,* 21-792 (La. 10/1/21), 324 So.3d 1054, and *writ denied,* 21-775 (La. 10/1/21), 324 So.3d 1059, another pre-*Pete* case in which it had affirmed wrongful death awards of $500,000.00 to each of two adult children whose father died of mesothelioma. Notwithstanding its finding that awards in similar cases ranged between $500,000.00 and $750,000.00, the Fourth Circuit upheld the wrongful death awards of $2.75 million each in *Stauder II,* finding no abuse of discretion under the unique facts of that case.[26] The Louisiana Supreme Court denied writs, allowing the awards to stand. *Stauder v. Shell Oil Co.,* 24-860 (La. 4/23/25), 406 So.3d 1175.

In reviewing the evidence presented at trial against the backdrop of these cases, we cannot say that the district court abused its vast discretion in awarding Ms. Reeves and Ms. Carr $700,000.00 (actually, $630,000.00) each in wrongful death damages. Those amounts are well under the amounts awarded in *Stauder II* and *Williams, supra,* under similar circumstances and, accordingly are affirmed. Further, we decline to vacate the awards of funeral expenses and the costs associated with hospice care, as requested by UCC, since we have found that Ms. Perry's lung cancer was a

---

[26] The evidence in *Stauder II,* demonstrated that the decedent and his daughters had been extremely close. One of the daughters, Shelley, suffered from a mental disability. She lived in a house located on her father's property for approximately five to six years. She visited her father daily and often had dinner with him. Shelley helped to take care of her father once he was diagnosed with mesothelioma and was with him when he died. At the time of trial, Shelley was still grieving her father.

The other daughter, Jill, a registered nurse, was also very close to her father. Before her father's diagnosis, they played golf, watched Saints games, and golf matches together, had dinner together every weekend, and talked all the time. Jill felt that she and her father shared a stronger bond because of the loss of their brother. After her father's diagnosis, Jill helped to take care of him and was with him when he died. She subsequently relocated to New Zealand with a man that she met and married after her father's death. She stated that it was too hard to stay in New Orleans after her father died. She also testified that she had a difficult time enjoying her wedding because her father was not there and she was very upset that her father would never meet her son.

substantial contributing cause of her ultimate death and was also a substantial contributing cause relative to her need for hospice care.

**UCC's Assignment of Error No. 3**

The district court awarded survival damages in the amount of $2,756,869.36, to be reduced to $1,378,434.68, after accounting for the virile share of one-half assigned to Boise. Survival damages are awarded for the pre-death mental and physical pain and suffering of the deceased. *Raymond*, 40 So.3d at 1192. "Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear, or mental anguish during the ordeal leading to the death is compensable." *Leary v. State Farm Mut. Auto Ins. Co.,* 07-1184 (La. App. 3 Cir. 3/5/08), 978 So.2d 1094, 1098, *writ denied,* 08-727 (La. 5/30/08), 983 So.2d 900. (Citation omitted)

*Pete, supra,* involved general (survival) damages in the case of a 74-year-old longshoreman who had developed mesothelioma. The evidence showed that Mr. Pete underwent several procedures, became depressed and had a great deal of worry about his family. He underwent chemotherapy and other forms of treatment which were very hard on him mentally and physically. Due to his condition, he was unable to enjoy the activities he had previously enjoyed. He was often tired, listless and short of breath. Mr. Pete also experienced fear as a result of the terminal nature of his illness. 379 So.3d at 646-47.

The jury awarded nearly $10 million in damages and the district court entered judgment in conformity with the award. The defendant appealed the quantum and the Fourth Circuit upheld the award (*Pete v. Boland Marine & Mfg. Co., LLC,* 21-626 (La. App. 4 Cir. 1/5/23), 356 So.3d 1137, 1164). The Supreme Court granted writs and found that the district court had abused its discretion in entering judgment conforming to the jury's award. *Pete,* 379 So.3d at 650.

In reviewing the award, the Court emphasized that an award of $4 million in survivor damages to a former insulator had been affirmed in *Lege, supra.* The evidence in *Lege* demonstrated that the decedent lived for two years following his diagnosis, during which he suffered shortness of breath, endured several procedures, underwent chemotherapy, and became bedridden. He also suffered from pain and delusions, struggled with his diagnosis and became depressed. *Lege,* 356 So.3d at 636.

The Court found that awards ranging from $1.5 million to $3 million had been affirmed in other cases that it reviewed. The Court also pointed out that survival damages of $4.8 million had been awarded but not appealed in *Stauder I* and that $3 million in survival damages had been awarded but not appealed in *Berry v. Anco Insulations,* 52,671 (La. App. 2 Cir. 5/22/19), 273 So.3d 595, to a woman who contacted mesothelioma from her exposure to asbestos on the clothing of her husband.

The Court then found that the district court had abused its discretion in confirming the $10 million award in *Pete.* Based on its review of the cases discussed above, the Court reduced the award to $5 million, which it found was the highest amount that was reasonably within the jury's discretion to award for survivor damages in that case. Based on the evidence adduced at trial relative to Ms. Perry's suffering, distress and depression due to her ever worsening condition for a period of some two years, we cannot say that the district court abused its vast discretion in awarding survivor damages of $1,378,434.68 (one-half of $2,756,869.36) against UCC in this case and the award is affirmed.

## DECREE

For all of the reasons stated above, the Final Judgment of the district court, as amended by the Amended Final Judgment, is hereby **AFFIRMED.**

**AFFIRMED**

| | |
|---|---|
| SUE PERRY, ET UX | NO. 24-CA-535 |
| VERSUS | FIFTH CIRCUIT |
| EMPLOYERS INSURANCE OF WAUSAU, ET AL | COURT OF APPEAL |
| | STATE OF LOUISIANA |

## SCHLEGEL, J., CONCURS IN PART AND DISSENTS IN PART WITH REASONS

I concur in part and dissent in part with the majority opinion.

I concur with the majority's finding that this Court review the question of causation *de novo*. As noted by the majority, the trial judge's inappropriate independent scientific research was prejudicial, materially affected the outcome of the case, and deprived the parties of substantial rights. I also agree with the majority upon *de novo* review that plaintiffs provided sufficient evidence to prove that Ms. Perry's lung cancer was a substantial contributing factor to her death. Furthermore, I concur with the decision to affirm the amount the trial court awarded for survival damages.

I write separately, however, because I disagree with the majority's decision to include a discussion on the split between circuits related to whether the cause of death listed in the death certificate is admissible or creates a rebuttable presumption. This circuit has opined that a death certificate does in fact constitute prima facie evidence of the facts stated therein that can be controverted or overcome with appropriate evidence. I concur with the majority that even though the death certificate lists COPD as the only cause of death, after conducting a *de novo* review of the medical records and expert testimony, the evidence supports a finding that lung cancer and COPD were both contributing causes of Ms. Perry's death. There is no need for a further discussion about a

split in the circuits as it only leads to confusion. Furthermore, the statement that

the "Louisiana Supreme Court has not opined on the issue whether a death

certificate is admissible for the purpose of showing the cause of death" suggests

that this issue has not been answered. It has.

La. R.S. 40:42(A) provides that a certificate of death/birth is prima facie

evidence of the facts stated in the certificate:

> A. Except for delayed or altered certificates, every original certificate on file in the vital records registry is prima facie evidence of the facts therein stated. The names of parents as entered on birth and death records shall not be deemed to be prima facie evidence of the existence of a marriage between the said parents.

> B. Certified copies of original certificates shall be admitted as evidence under the same conditions as the original certificate. . ..[27]

And in our civilian tradition, Louisiana courts begin every legal analysis

"by examining primary sources of law, consisting of the constitution, codes, and

statutes; jurisprudence, even when it rises to the level of *jurisprudence constante*,

is a secondary source." *Bergeron v. Richardson*, 20-1409 (La. 6/30/21), 320

So.3d 1109, 1116. When enacting La. R.S. 40:42(A), the legislature could have

---

[27] La. R.S. 40:34.10(19) requires that a death certificate "shall contain" . . . the "(d) Cause of death, showing the course of the disease or the sequence of causes resulting in the death; and contributory or secondary causes, the duration of each, and whether any primary or secondary causes of death are attributed to dangerous or insanitary conditions of employment. If the cause of death was violent, the certificate shall show the determination of the coroner as to whether the death was probably accidental, suicidal, or homicidal." Further, La. R.S. 13:5713(E) governs a coroner's determination of the cause of death in a death certificate as follows:

> E. (1) The coroner shall furnish a death certificate based on his examination, investigation, or autopsy, and he shall state as best he can the cause and manner of death.

> (2) If it appears that death was due to accident, suicide, or homicide, he shall so state.

> (3) The cause of death, and the manner or mode in which the death occurred, as incorporated in the death certificate as provided in the Vital Statistics Laws, R.S. 40:32 et seq., filed with the division of vital records of the Louisiana Department of Health, shall be the legally accepted cause of death, unless the court of the parish in which the death occurred, after a hearing, directs otherwise.

> (4) In the case of a death without medical attendance, if there is no reason to suspect the death was due to violence, casualty, or undue means, the coroner may make the certificate of death from the statement of relatives, persons in attendance during the last sickness, persons present at the time of death, or other persons having adequate knowledge of the facts.

---

24-CA-535                              2

easily excluded the "cause of death" from the prima facie evidence standard, just as it did with the issue of whether a marriage exists between the parents listed on the birth or death certificate in the second sentence of the provision. The settled rules of statutory construction provide that when the legislature specifically enumerates certain items, but then omits others that could have easily been included in the statute, the omission is deemed intentional. *See Filson v. Windsor Court Hotel*, 04-2893 (La. 6/29/05), 907 So.2d 723, 728.

In addition, this Court held that a death certificate was properly admitted into evidence in a workers' compensation proceeding as an exception to the hearsay rule under La. C.E. art. 803(9), and constituted prima facie evidence of the facts contained therein pursuant to La. R.S. 40:42 in *Morris v. Reve, Inc.*, 95-310 (La. App. 5 Cir. 10/18/95), 662 So.2d 525, 528, *writ denied*, 95-3037 (La. 2/16/96). 667 So.2d 1055. *See also* 2 La. Prac. Pers. Inj., §12:164, Russ M. Herman and Joseph E. Cain ("Death certificate, certified as an official document, is admissible in evidence and is prima facie evidence of cause of death", citing La. R.S. 40:42.)

Finally, I dissent in part with the majority's decision to limit its *de novo* review of this case to the causation issues only. I believe that the trial court's decision to look outside of the record and conduct independent research for evidence to support plaintiffs' claims was an egregious error and indicates a potential bias that requires *de novo* review of all of the trial court's rulings, including the damages awarded by the trial court. The trial court's judgment should be given no deference.

Accordingly, I also dissent with the majority's determination that the trial court did not abuse its discretion with respect to the amount of wrongful death damages awarded to Ms. Perry's adult daughters, Donnette Reeves and Patricia

Carr. And upon a *de novo* review, I would reduce the awards to Ms. Perry's adult children to $500,000 each as requested by UCC.

The $700,000 award to each of these plaintiffs is excessive considering that no unique or extraordinary circumstances exist in this matter to support a wrongful death award on the higher end of the scale when compared to prior cases with similar circumstances. Both plaintiffs are adult children who were not reliant on Ms. Perry for support. Further, at the time of her death, Ms. Perry was advanced in age and ill due to COPD and lung cancer attributable not only to asbestos exposure, but also her significant smoking history.

UCC argues that in an asbestos case, *Thomas v. A.P. Green Industries, Inc.*, 05-1064 (La. App. 4 Cir. 5/31/06), 933 So.2d 843, the jury awarded wrongful death damages in the amount of $200,000 to one adult child and $250,000 to several others. In another asbestos case, *Roberts v. Owens-Corning Fiberglass Corp.*, 03-248 (La. App. 1 Cir. 4/2/04), 878 So.2d 631, *writ denied*, 04-1834 (La. 12/17/04), 888 So.2d 863, the appellate court affirmed awards of $250,000 for wrongful death claims to each adult child. In *Glaser v. Hartford Fire Ins. Co.*, 22-593 (La. App. 4 Cir. 8/30/23), 375 So.3d 479, *writs denied*, 23-1346 (La. 1/10/24), 376 So.3d 130, 23-1314 (La. 1/10/24), 376 So.3d 134, and 23-1300 (La. 1/10/24), 376 So.3d 136, cited by the majority, the First Circuit recently reduced wrongful death awards of $1.5 million dollars to each of the decedent's adult children to $500,000. At trial, the children testified that they had a close relationship with their father, saw him several times a week, and worked with him. The First Circuit found that the awards were an abuse of discretion because, just as in the present matter, the adult children were not members of the household and were not dependent on their father for support. In *Lege v. Union Carbide Corp.*, 20-252 (La. App. 4 Cir. 4/1/21), 365 So.3d 617, 638-40, *as clarified on reh'g*, 20-252 (La. App. 4 Cir. 5/12/21), 366 So.3d 75, *writs denied*,

21-792 (La. 10/1/21), 324 So.3d 1054, and 21-775 (La. 10/1/21), 324 So.3d 1059, also discussed by the majority, the appellate court affirmed an award of $500,000 to two adult children who testified regarding their close relationship with their father who died from mesothelioma caused by asbestos exposure.

The majority also cites to two additional cases, *Williams v. Placid Oil Co.*, 16-839 (La. App. 3 Cir. 8/2/17), 224 So.3d 1101, *writ denied*, 17-1501 (La. 11/17/17), 229 So.3d 929, and *Stauder v. Shell Oil*, 22-593 (La. App. 4 Cir. 6/3/24), 409 So.3d 1, *writ denied*, 24-860 (La. 4/23/25), 406 So.3d 1175, where wrongful death damages in the amounts of $750,000 and $2,750,000, were awarded to each adult child respectively. These cases are distinguishable because the appellate courts recognized that they involved extraordinary and unique circumstances. The *Williams* court recognized that while the $750,000 award was on the high end for wrongful death claims, the extraordinarily close relationship that the plaintiffs had with their mother rendered the award reasonable. *Id.* at 1114. The *Sauder* court also recognized that the matter involved unique circumstances. *Id.* at 7-8. One of the adult daughters had pre-existing mental issues that further deteriorated due to her father's death to the extent that she was unable to testify in person at trial. The daughter lived in a separate house on the same property as her father and had dinner with him every night. The other daughter testified that she moved out of the country after her father's death because she could not bear to remain in the area.

In the present matter, Ms. Perry's adult children did not testify about any extraordinary or unique circumstances regarding the relationship they had with their mother or the effect her death had on their lives. Therefore, upon *de novo* review, I do not agree that this matter warrants a high-end wrongful death award.

24-CA-535                                    5

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. TRAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



### FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 6, 2025** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-CA-535

### E-NOTIFIED
23RD JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JAMES E. KUHN (DISTRICT JUDGE)
LEWIS O. UNGLESBY (APPELLEE)          WELLS T. WATSON (APPELLEE)          AMANDA FRASER (APPELLANT)
LEIGH ANN TSCHIRN SCHELL
(APPELLANT)

### MAILED
ERNEST G. FOUNDAS (APPELLANT)
FRANCIS X. DEBLANC, III (APPELLANT)
MCGREADY L. RICHESON (APPELLANT)
MILELE N. ST. JULIEN (APPELLANT)
PERREY S. LEE (APPELLANT)
ATTORNEYS AT LAW
1100 POYDRAS STREET
SUITE 3600
NEW ORLEANS, LA 70163

JAMIE F. GONTAREK (APPELLEE)
LANCE C. UNGLESBY (APPELLEE)
ATTORNEYS AT LAW
607 ST. CHARLES AVENUE
SUITE 300
NEW ORLEANS, LA 70130

JORDAN D. SHEA (APPELLANT)
TIMOTHY J. MOREL (APPELLANT)
WILLIAMS BARBER MOREL
233 SOUTH WACKER DRIVE
SUITE 6800
CHICAGO, IL 60606

MADISON C. ROWLAND (APPELLEE)
ATTORNEY AT LAW
112 FOUNDERS DRIVE
BATON ROUGE, LA 70810

KEVIN M. JORDAN (APPELLANT)
WALTER G. LYNCH (APPELLANT)
ATTORNEYS AT LAW
JORDAN, LYNCH & CANCIENNE, PLLC
1980 POST OAK BOULEVARD
SUITE 2300
HOUSTON, TX 77056

JEFFREY T. GAUGHAN (APPELLEE)
ATTORNEY AT LAW
3006 COUNTRY CLUB ROAD
LAKE CHARLES, LA 70605

THOMAS J. KLIEBERT, JR. (APPELLEE)
ATTORNEY AT LAW
POST OFFICE BOX 130
PAULINA, LA 70763